**PABST BREWING COMPANY, INC., Plaintiff–Appellee,**

v.

**Jack S. CORRAO, Defendant–Appellant.**

No. 97–4208.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1998.

Decided Nov. 13, 1998.

William M. Bitting, Dean E. Dennis (argued), Hill, Farrer & Burrill, Los Angeles, CA, for Plaintiff–Appellee.

William A. Wertheimer, Jr. (argued), Southfield, MI, for Defendant–Appellant.

Michael Schloss (argued), Department of Labor, Office of Solicitor, Washington, DC, for Amicus Curiae.

Before POSNER, Chief Judge, and RIPPLE and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

There was a time when the beer industry in Milwaukee was king, and Pabst Brewing Company was an important member of the royal court. At least with respect to Pabst's role in Milwaukee, those days are over. In its struggle to survive, Pabst looked around for ways to save money and hit upon the level of welfare benefits it was paying to its retired employees as a potential place for cuts. When it terminated certain employee benefits for retirees, however, it took the precautionary step of filing a declaratory judgment action under the Employment Retirement Income Security Act, better known as ERISA, seeking a clean bill of health for its own actions. Its complaint purported to sue a defendant class, and it named Jack S. Corrao as the representative of that class. Corrao eventually counterclaimed for the lost welfare benefits, again supposedly both individually and on behalf of the class. The district court dismissed Pabst's claim for lack of subject matter jurisdiction, but the victory was a Pyrrhic one for Corrao, because the court also dismissed Corrao's counterclaim under Fed.R.Civ.P. 12(b)(6)—ironically thereby giving Pabst everything it had hoped to secure in the original action. See *Pabst Brewing Co. v. Corrao*, 176 F.R.D. 552 (E.D.Wisc.1997). Corrao has appealed; unsurprisingly, Pabst took no cross-appeal from the dismissal of its declaratory judgment action.

I

For literally more than a century, the Brewery Workers union ("the union") has represented the production and maintenance employees at Pabst's Milwaukee plant. In 1953, the union succeeded in having health and life insurance benefits for employees, and pensions for retirees, included in the governing multiple employer collective bargaining agreement (CBA). Over the years, succeeding CBAs included more and better welfare benefits for active employees and retirees alike. Typically, the language of the agreements said nothing about the intended duration of the benefits. For example, Article VII of the 1955 CBA said only "For employees in retired status under the Pension Plan as of June 1, 1955 and who shall retire thereafter, a Death Benefit in the amount of $1,000." Other than the various improvements that entered the CBA from time to time, its basic structure remained unchanged until 1983, when the last multiple employer contract between the union and the companies expired.

In 1984, in addition to the switch to an individual contract between Pabst and the union, the structure of the health insurance clause changed significantly. The final contract addressed this subject in Article VII, which read as follows:

> For the term of this Agreement, the Employer, at its sole cost and expense, shall provide major medical, health, dental, sickness and accident, and life insurance

benefits in accordance with an[d] as summarized in Appendix A attached. It is understood that the benefits set forth may be provided by specifically referred to plans or equivalent benefits will be provided under different plans including self insurance by the Employer, and further that the actual insurance policies, documents or plans shall control over the summary set forth in Appendix A in the event of conflicting provisions.

Other provisions of the 1984 agreement and subsequent ones did not include the preliminary phrase "[f]or the term of this Agreement." For example, Appendix A, ¶ 4(a)(1) ("the spousal benefit clause"), states that "[h]ealth insurance for covered dependents of an active employee who dies shall continue for six (6) months following the month in which the death occurs." Another provision in Appendix A, ¶ 4(b)(3) ("the disability benefit clause"), indicates that "[t]hose retirees on Total and Permanent disability retirement currently not covered by Major Medical will be covered until they reach age 65." The latter language appears in a section of Appendix A dedicated to "retired employees and dependents." That part of the Appendix also states that "[e]mployees in retired status and their dependent spouse who are enrolled in government Medicare Plans A and B shall be provided Blue Cross and Blue Shield Medicare Extended coverage."

Although the 1984 agreement and its successors did not contain a clause labeled "Integration Clause," Article XXV, entitled "Severability," had language touching on the question of integration. In pertinent part, Article XXV said:

It is the intent and purpose of the parties that this agreement be in full and complete compliance with all applicable state and federal laws, rules and regulations, *and that it covers the entire agreement of the parties.*

(Emphasis added.) The remainder of the Article promised that no other subjects would be opened for bargaining during the term of the agreement and addressed the severability issue.

From the time the 1984 contract went into effect until the expiration of the last agreement in 1996, Pabst never formally cut back on retiree benefits (though it did change delivery mechanisms more than once). Indeed, during a period of time in 1990 when there was no agreement in force and the employees were striking, Pabst continued to provide benefits to retirees. It did so again in 1993 and 1995 when the agreements expired without successor agreements in place. On the other hand, each agreement in turn after 1984 had language addressing the term of the agreement. Article XXIX of the 1993–1996 CBA, which is the one directly pertinent to the present case, read as follows:

This Agreement cancels and takes the place of all previous contracts and agreements and shall continue in force and effect from June 1, 1993 until June 1, 1996 and shall continue in full force and effect from year to year after June 1, 1996 by automatically renewing itself unless at least sixty (60) days prior to June 1, 1996 or any anniversary date thereafter either party gives written notice to the other of its desire to terminate or modify this Agreement.

During the term of each succeeding agreement, Pabst conferred on the retirees the benefits provided by the agreement then in force. In other words, if a worker had retired in 1986, Pabst did not freeze the welfare benefits that the 1986 agreement had provided and give only them. Instead, it changed retiree benefits along with benefits to active workers. In 1988, for example, the retirees were placed on a managed healthcare plan known as the Advantage Program. In 1990, the company implemented a Preferred Provider Organization (PPO) for them. The retirees accepted these changes as they occurred.

Perhaps they acquiesced because not a single one thought that any of those changes were adverse, perhaps they did so because the changes did not seem significant enough to warrant protest—we do not know, and the record casts no light on the answer to that question. What is clear is that Pabst's declining fortunes brought a much more drastic change in 1996. In that year, its Milwaukee division expected to lose about $8.6 million. Retiree benefits cost the company approxi-

mately $3.5 million per year, according to Pabst. When the 1993–1996 CBA expired, Pabst notified its retired workers that it would discontinue the death benefit as of August 1, 1996, and that it would discontinue health benefits as of September 1, 1996. Later, at the end of 1996, Pabst shuttered its Milwaukee brewery altogether.

This news came as a tremendous shock for the retirees, who had been under the impression that their retirement benefits were secure. This litigation followed, and as noted above, they were unsuccessful in the district court. Because the procedural posture of the case at this point is more complicated than meets the eye, we now clarify exactly who is suing over what as the case reaches us.

## II

Unlike the usual ERISA case in which a group of employees (past or present) is suing for benefits under a welfare plan, in this case Pabst itself initiated the litigation. It filed what it styled a "class action complaint" for a declaratory judgment on August 12, 1996, naming Corrao individually and as the representative of a "subclass" of some 774 Pabst retirees who were represented by the union during the time of their employment. It also named James P. Murdock as a representative of another subclass of 43 Pabst employees who had not been represented by the union. Although it may be stating the obvious, Pabst was the plaintiff in this declaratory judgment action, which means that the two classes were being sued as defendant classes. Pabst wanted a declaratory judgment that its "termination of eligibility and elimination of benefits to the Class Retirees

under the Plans is not violative of [ERISA] and is otherwise lawful in all respects."

Corrao answered the complaint on August 27, 1996, and filed a counterclaim, again on behalf of himself and the entire class of retirees that Pabst had described. In the counterclaim, which he based on both § 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), and ERISA § 502, 29 U.S.C. § 1132(e), he claimed that the CBAs between the union and Pabst gave the retirees lifetime rights to health insurance and life insurance benefits. He further asserted that these benefits, because they were vested lifetime benefits, survived the expiration on May 31, 1996, of the 1993–1996 CBA, and he sought to enforce the agreements that gave rise to their benefits.

Along with his answer and counterclaim, Corrao filed a motion for a "Temporary Restraining Order and/or Preliminary Injunction" to prevent Pabst from unilaterally terminating the retirees' health benefits. (The motion did not mention life insurance.) The district court held a hearing on the motion on August 29, 1996, in which it took the step of orally certifying Corrao as the class representative of the union retirees solely for purposes of the temporary relief. After that hearing, the court granted Corrao's motion for a temporary restraining order and set an evidentiary hearing on the preliminary injunction request for September 16, 1996. At that hearing, the court again orally certified Corrao as the representative of the class of union retirees for purposes of the preliminary injunction. After considering the evidence presented, however, the court denied the request for an injunction. See *Pabst Brewing Co. v. Corrao*, 940 F.Supp. 217 (E.D.Wisc.1996).[1] It found that

---

1. Although in this particular case the opinion of the district court was not hard to find, because it had been published, we note that Corrao violated Circuit Rule 30 when he failed to include it with his brief. His certification that all the materials required by Circuit Rule 30(a) and (b) were included, which is required by Circuit Rule 30(c), is also inaccurate. Under Rule 30(b)(1), as amended December 1, 1997 (well before Corrao's brief was filed), the appellant has the unambiguous duty to include in the Appendix *all* "opinions, orders, or oral rulings in the case that address the issues sought to be raised." No one

could dispute the relevance of the district court's September 27, 1996 opinion, because it is there that the court explained in the greatest detail why it found the CBA unambiguous. We are at a loss to understand what it is that could be unclear about Rule 30, or what language would drive home the point even more strongly that the judges of this court need to have conveniently before them all rulings from the tribunal from which the appeal is being taken. Along with this opinion, we are issuing an order to appellant's counsel to show cause why he should not be sanctioned for this disregard of the rules.

the language of the 1993–1996 CBA was unambiguous and thus it should not resort to extrinsic evidence that might have shown that the parties had a different understanding. The key phrase was the one that began Article VII: "For the term of this Agreement." The court found that this strongly indicated that the retirees' claim would fail on the merits, and thus that the requested preliminary injunction should not issue.

Between the date of the ruling on the preliminary injunction and the court's resolution of both Pabst's claim and Corrao's counterclaim, no further action was taken on the class allegations. Counsel for Corrao informed us at oral argument that this was because discovery was proceeding, and he had judged that the time was not yet ripe for a formal motion to certify the class. Oddly, Pabst was content not to force the issue either, even though it was the one that had haled the defendant class into court in the first place. In the end, the discovery process was cut short by the court's decision to take up Pabst's motion to dismiss Corrao's counterclaim under Fed.R.Civ.P. 12(b)(6) and Corrao's motion to dismiss Pabst's declaratory judgment complaint for lack of subject matter jurisdiction. For essentially the same reasons as it denied preliminary injunctive relief, the court concluded that Corrao's complaint (as supplemented by the CBAs and insurance agreements themselves, to which the complaint referred) failed to state a claim upon which relief could be granted. In so ruling, the court drew no distinction between the people who had retired before the 1984 CBA took effect and those who retired afterwards. The court also took no further steps with respect to class certification, and thus never considered which subsection of Fed. R.Civ.P. 23(b) applied to Corrao's putative class.

Next, in light of its conclusion about the meaning of the CBAs, the court denied Corrao's motion to file an amended counterclaim, which would have (1) pleaded further facts in support of the § 301 and § 502 claims, (2) added counts for breach of fiduciary duty in violation of ERISA, (3) expanded the damage allegations, and (4) fleshed out the class action allegations. The first part of the proposed amendment did not address the deficiencies the court had found, and it found Corrao's ten-month delay between the denial of the preliminary injunction and the motion to amend to have been an unreasonably long period of time after which to seek to amend the complaint.

Last, the court granted Corrao's motion to dismiss Pabst's declaratory judgment action for lack of subject matter jurisdiction. Pabst had alleged jurisdiction under 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. § 2201 (which, as we have often noted, is not a jurisdictional statute), since it was seeking a ruling about its obligations under ERISA (or the retirees' potential claims, which it treated as the same thing). It also alleged jurisdiction under the diversity statute, 28 U.S.C. § 1332(a). The court rejected Pabst's federal question argument, because § 502 of ERISA, 29 U.S.C. § 1132(a), gives a right of action only to plan participants and plan beneficiaries, and Pabst was neither. The fact that this was a declaratory judgment action did not allow Pabst to piggyback on the jurisdiction that would have existed if the retirees had sued first. The court also rejected Pabst's effort to invoke the diversity jurisdiction, even though it conceded that the parties appeared to be of diverse citizenship and the amount in controversy was satisfied, because Pabst had alleged neither a state nor a federal claim. It strikes us that both these rulings would more properly have been characterized as decisions that Pabst had failed to state a claim on which relief can be granted, after *Steel Co. v. Citizens for a Better Environment*, —— U.S. ——, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998), but we need not tarry on the point since Pabst has taken no cross-appeal.

### III

Although neither party briefed the question, at oral argument we asked about the consequences of the lack of formal class certification on this case. Plainly, Corrao's claim has been ruled on and is properly before us. Cf. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 570–71 (7th Cir.1995) (finding that a notice of appeal under Fed. R.App. P. 3(c) must clearly indicate if a

putative class representative is appealing on behalf of the class, and concluding further that the named representative's claim was properly before the court). But it is logically impossible for anything else to be here. Neither Pabst nor Corrao ever moved for class certification. The district court has never considered such fundamental questions as whether Corrao, a post-1984 retiree, may function as a class representative for all the retirees, or only for those who like him retired after 1984; whether the numerosity, commonality, typicality, and adequacy of representation criteria of Rule 23(a) are satisfied here; or which subsection of Rule 23(b) applies to this class. The latter point may be the most important of all, for if Corrao's effort to enforce the CBAs for the retirees is in essence a claim for money damages, and if the strict necessity underlying Rule 23(b)(1) classes does not exist, then the only remaining possibility would be certification under Rule 23(b)(3). As is well known, unnamed members of (b)(3) classes have a right to notice of the pending class action and to an opportunity to opt out, under Rule 23(c)(2). In decisions from *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), to *Phillips Petroleum v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), the Supreme Court has made it clear that unnamed members in some situations have a due process right to these procedural protections or their equivalent. This court, too, has had occasion to note that the due process rights of unnamed class members of a defendant class are entitled to special solicitude, and their due process interests preclude altogether a defendant class under Rule 23(b)(2). See generally *Henson v. East Lincoln Township*, 814 F.2d 410 (7th Cir.1987), *cert. dism'd*, 506 U.S. 1042, 113 S.Ct. 1035, 122 L.Ed.2d 111 (1993); *Channell v. Citicorp National Servs., Inc.*, 89 F.3d 379, 387 (7th Cir.1996). See also *Thompson v. Board of Education of Romeo Community Schools*, 709 F.2d 1200, 1204 (6th Cir.1983); *Paxman v. Campbell*, 612 F.2d 848, 854 (4th Cir.1980); but see *Marcera v. Chinlund*, 595 F.2d 1231, 1238 (2d Cir.1979) (permitting (b)(2) defendant class against a group of similarly situated public officials).

For all this record shows, everyone in the class was unaware that his or her rights were being adjudicated except Corrao himself and Leon Rubitsky, whose name appears in the proposed first amended counterclaim as a putative representative of the subclass of individuals who retired prior to June 27, 1984. Under the law of judgments, the court's decision that the complaint failed to state a claim operates as a decision "on the merits," such that anyone who is properly a part of the case will be barred from bringing a later action. See *Paganis v. Blonstein*, 3 F.3d 1067, 1071 (7th Cir.1993). In this case, as always, it is of the utmost importance to be clear about the status of class actions, so that all concerned will know whose rights are at stake. If someone had moved for class certification and the district court had granted it, the questions we posed in the previous paragraph would have necessarily been answered. If certification had been denied, the aggrieved party could have taken an appeal from that ruling at the appropriate time. On the record before us, unfortunate as it may seem, we have no choice but to treat this as Corrao's individual case and his individual appeal. We express no view on the effect that the lack of clarity about this point, up until now, might have on the rights of the unnamed members of the putative class to sue on their own.

## IV

On the merits, we agree with the district court that the central question is whether the language of the relevant CBAs is ambiguous or not. We also agree that the starting point for analysis is this court's *en banc* decision in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993). Like this case, *Bidlack* involved an assertion of a right to lifetime health benefits on behalf of retired employees of a company. As the court pointed out there, whether or not the retirees were entitled to such benefits depended entirely on the contract between the company and the employees, and there, as here, that contract was a collective bargaining agreement. *Id.* at 604–05. ERISA does not require the vesting of welfare benefits; if they vest at all, they do so under the terms of a particular contract.

The first question considered in *Bidlack* was whether the absence of express language in the CBA indicating that the retirees had a vested right in lifetime health benefits was fatal to their claim. Qualifying the earlier decision in *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806 (7th Cir.1992), both opinions in support of the result concluded that it was not. The lead opinion also recognized that it is possible for a contract to create obligations that survive the termination of the agreement, such as a post-employment restrictive covenant or a commitment to arbitrate disputes. Nevertheless, because of the gravity of assuming that a fixed term contract (as CBAs invariably are) has created a perpetual obligation, the lead opinion argued for a presumption that a CBA ceases to obligate the employer when its term is up. *Bidlack*, 993 F.2d at 606–07. (The dissenters would have gone even farther in this direction.) Rejecting the twin extremes of requiring an explicit formula of words to defeat the presumption and of permitting unlimited testimony about the parties' subjective intentions, the lead opinion adopted the middle ground, whereby the language of the agreement would govern unless the parties could show that extrinsic evidence was necessary (1) to show that a written contract that appears to be clear is actually ambiguous, (2) a term or terms in the contract are ambiguous, or (3) that there is "some yawning void ... that cries out for an implied term." *Id.* at 608. If the agreement is plausibly complete on its face, then extrinsic evidence cannot be used to add terms to it. *Id.*

Applying these rules to the agreements before it, a majority of the judges in *Bidlack* agreed that they were vague and inconclusive on the question whether some kind of right to lifetime health benefits had vested in the retirees. (The dissenters disagreed about the consequences of this vagueness, not about whether it existed.) Some terms, such as one similar to the spousal benefit clause here, said once retirees reached the age of 65 the company would pay the full cost for their health insurance, and that after their death, their spouses would receive supplemental health benefits, again at the company's expense. Because nothing in the agreement qualified that clause or tried to tie it to the duration of the CBA, the majority favoring reversal thought that it offered some evidence that the benefits were to last for life. *Id.* Without extrinsic evidence to clarify the CBA, it was impossible to say whether the company had promised lifetime health benefits or not. Importantly, the lead opinion did not address the important question of the level of benefits—a point that the dissenters emphasized—nor did it reach the question whether the benefits could change or ratchet up with each succeeding CBA, or if they froze at the level provided in the agreement that created the vested rights.

Post–*Bidlack* decisions in cases involving retiree entitlements to health or welfare benefits have reflected the critical importance of the language of the agreement. In *Murphy v. Keystone Steel & Wire Co., supra*, the court upheld a grant of summary judgment for the company on the ground that the contract was unambiguous and that it clearly indicated that the retirees' benefits did not vest. Unlike the CBA in *Bidlack*, the one in *Murphy* addressed the duration of the benefits and provided that they would "remain in effect during the term of this agreement...." 61 F.3d at 565. The Plan itself said that retiree coverage would terminate "upon the date the Plan is terminated or amended to terminate the Retiree's coverage." *Id.* at 565–66. The court found that extrinsic evidence could not be used to contradict the meaning of these terms, but it also commented that the plaintiff's *objective* extrinsic evidence was consistent with its reading of the CBA in any event. *Id.* at 567. On the other hand, in *Diehl v. Twin Disc, Inc.*, 102 F.3d 301 (7th Cir.1996), the court reviewed a retiree benefit claim brought under an agreement that explicitly said that "[a]ll persons retired prior to the date of termination of the [Retirement] Plan ... shall, notwithstanding [the Insurance Agreement], be entitled for the lifetime of the pensioner (including the surviving spouse until death or remarriage), to the life insurance and hospitalization, medical and surgical expense benefit coverages...." *Id.* at 302–03. Even though there were other parts of the agreement that might have supported a finding in the company's favor, the court found

this to be enough to show that the contract gave the retirees certain vested rights in a lifetime benefit. It remanded for further proceedings to explore the question whether certain modifications to the plan effectively cut off the retirees' rights.

In the classic common law style of reasoning by analogy, we are asked to decide whether Corrao's case is more like *Bidlack* and *Diehl*, or more like *Murphy*. Not only Corrao, but the Secretary of Labor appearing as amicus curiae, urge us to place Corrao on the *Bidlack/Diehl* side of the line. In the Secretary's view, the agreement here has the same ambiguity that the lead opinion in *Bidlack* identified in the following passage:

> For the provision [*i.e.* the CBA spousal benefit clause] does not say "when they die or the collective bargaining agreement expires, whichever occurs first," but simply when they die.

*Bidlack*, 993 F.2d at 608. Corrao and the Secretary think our case is indistinguishable from *Bidlack* in this crucial respect, because Pabst too had a spousal benefits clause very much like the one at issue in *Bidlack*, and the Pabst clause (like the one in *Bidlack*) did not say that the retirees and their spouses would get benefits until death, or six months later for the spouse, or until the CBA expired, *whichever occurs first*.

It is certainly true that the spousal benefit clause itself did not have the phrase "whichever occurs first" in it, nor did the disability benefit clause. Corrao, however, retired on July 1, 1996, which means that any rights he had at the time of retirement arose under a CBA that included the version of Article VII we quoted at the beginning of this opinion. That clause contained the central promise by Pabst, the employer, to provide "major medical, health, dental, sickness and accident, and life insurance benefits" to its employees— active and retired alike. That promise extended "for the term of this Agreement." Furthermore, the benefit provisions analogous to those in *Bidlack* on which Corrao relies are all found in Appendix A to the agreement. While we agree with Corrao that the plain language of Article VII makes the language of the particular policies controlling vis-à-vis the summaries appearing in Appendix A, that fact does not take away from the broader point that the reference to Appendix A itself is qualified by the introductory phrase "for the term of this Agreement." In our view, this has the same effect as inserting that phrase in each of the Appendix A terms. And if that were done, we would have something very close to what the *Bidlack* court found lacking in the agreement before it.

In an effort to avoid this conclusion, which is essentially the same as the one the district court reached, Corrao strives mightily to persuade us that the phrase "for the term of this Agreement" is one of those contractual terms that may seem clear on its face but in reality is ambiguous, rather like the ship *Peerless* or the use of specialized trade jargon. Examination of Pabst's own negotiators' notes would prove, according to Corrao, that neither party intended to destroy the retirees' right to lifetime medical benefits when they introduced that phrase for the first time into the 1984 contract. Instead, it had a private, specialized meaning. But Corrao's argument breaks down at that point. Neither in his brief, in the Secretary's brief, or at oral argument, was anyone able clearly and succinctly to tell us definitively what that specialized meaning might be. Corrao suggested that it meant that the detailed descriptions of the benefits had been moved to Appendix A "for the term of this Agreement" and were thus not contained in the body of the CBA, but that does not make grammatical sense. "For the term of this Agreement" is an adverbial phrase, and the only verb that it could possibly modify is the word "provide." Paraphrased, Article VII says that for that particular three-year period, Pabst will provide the various benefits described in Appendix A. Breaking down the sentence, we see that the first phrase informs the reader about the duration of the action; the second identifies Pabst as the actor; the third reveals that the actor will "provide" something; and the last part says that the "something" is the Appendix A benefits.

The worst one can say about this interpretation is that it does not acknowledge that the union or the retirees may have had a

different subjective understanding about the duration of their benefits. We are well aware that it can be a terrible hardship for an elderly person who has been receiving benefits from a former employer suddenly to find the rug pulled out from under her. There is an element of betrayal as well, if the retiree/former employee understood that the "lifetime" health benefits were a form of deferred compensation for her work. But written agreements exist precisely because subjective understandings can vary so much from individual to individual. For what it is worth, Pabst's behavior suggests that it did not believe that it was forbidden to change benefit levels for retirees. It shifted the package around, and it imposed various forms of managed care on the retirees. A number of judges in *Bidlack* expressed concern about the "ratchet" argument, under which a retiree would be entitled to any improvement over the benefits that were payable at the time of retirement, but that if the company restricted benefits somehow, the retiree could never receive less than those that were in force when the lifetime entitlement "vested." Corrao is vague about the level of benefits he would be entitled to receive. Granted, the same thing was unclear in *Diehl*, and there we suggested that an employer might be able to make minor changes in a retiree's health plan, perhaps even going so far as to impose a PPO or an HMO on the retirees, without violating a promise to give lifetime benefits. Here we have the extreme case that *Bidlack* avoided: outright termination of benefits. Harsh though it may have been, however, we see no room in the language of this agreement to turn to Corrao's extrinsic evidence. We therefore express no opinion on an ancillary point he urges, which is that notes from the Pabst negotiators should be deemed "objective" evidence, even if his own understanding of the agreement is not. We are cognizant of the need when a collective bargaining agreement is at issue to respect the specialized usages of the workplace. *Cf. Brotherhood of Maintenance of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 639 (7th Cir.1998) (permitting consideration of the negotiators' understanding for the purpose of classifying a dispute as "major" or "minor" under the Railway Labor Act). On the other hand, as we have stressed in cases like *Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv. Inc.*, 870 F.2d 1148, 1151–53 (7th Cir.1989) (*en banc*), the written word must prevail over subjective understandings unless one of those gaps "crying out to be filled" exists or the agreement is genuinely ambiguous.

We find neither of those circumstances to be present here. We hold that the only claim that the district court had before it on the merits was Corrao's individual one, and the fact that the court never took steps to certify either the defendant class for Pabst's claim or the plaintiff counterclaim class Corrao sought to represent means that the unnamed members of the putative class were not properly drawn into this litigation. As for Corrao's claim, we AFFIRM the judgment of the district court dismissing his action for failure to state a claim. Each side shall bear its own costs on appeal. Corrao's lawyer must respond to our order to show cause within ten days of the date of this opinion.

RIPPLE, Circuit Judge, dissenting.

Today's opinion continues this circuit's incremental movement toward a new emphasis on literalism in the interpretation of labor contracts. Whatever might be the value of such a change in this court's jurisprudence— a matter upon which I need not comment extensively today—its retrospective application to labor contracts negotiated in a different legal ambiance and reflecting the tenor of labor relations at an earlier time is a matter requiring significant reflection. The impact of today's ruling on retired workers who spent their active work years in this circuit is significant. As Judge Cudahy pointed out in his opinion in *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603 (7th Cir.1993) (en banc), this new emphasis on literalism comes too late for those who have settled expectations based on the collective bargaining process of past years. Our retrospective rule of decision ought to be one that will most likely reflect the intent of the parties at the time that the agreement was made.

When we turn to the case before us, it is clear that this contract is sufficiently ambigu-

ous to require, even under the formula set forth in the lead opinion in *Bidlack*, that extrinsic evidence be admitted. The parties certainly did not believe that the issue of retiree benefits was expressed with singular clarity in the contract itself. Indeed, Pabst admitted as much in its opening pleading. Pabst's estimation of the clarity of the document is certainly substantiated by a study of the text of the contract. The majority places a great deal of emphasis on the clause "[f]or the term of this Agreement." But this clause is part of a sentence that can be read quite reasonably to mean that, during the term of the agreement, the benefits will be those specified by Appendix A—not that the benefits themselves exist only for the duration of the contract. This reading of the contract is also supported by several other aspects of the text. The contract provides that the dependents of a retiree will continue to receive benefits until six months after the retiree's death. As in *Bidlack*, this factor is evidence that the retiree's benefits were meant to continue until death. *See id.* at 608. The contract also provides that retirees on total and permanent disability "will be covered until they reach age 65." This provision presupposes that the benefits will continue longer than the term of the contract. *See id.* Even under the formulation articulated by the principal opinion in *Bidlack*, therefore, recourse to extraneous evidence is required.

Labor contracts are forged in the real world of labor-management negotiations. They rarely reflect the pristine symmetry of the textbook contract. When we ignore the process that produces such contracts, and notably the Secretary of Labor suggests that the majority's result does just that, we risk not only substantial injustice to the workers who depend on the collective bargaining process, but also substantial hardship to the communities that, in taking care of those now bereft of their benefits, must assume significant economic and social burdens.