In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-3682

RICHARD CHERRY, GEORGE JAMES,
and JOSEPH ROOP, on behalf of themselves
and all others similarly situated,

*Plaintiffs-Appellants,*

*v.*

AUBURN GEAR, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:03CV136—**Theresa Springmann**, *Judge.*

ARGUED FEBRUARY 6, 2006—DECIDED MARCH 17, 2006

Before FLAUM, *Chief Judge,* and ROVNER and SYKES,
*Circuit Judges.*

FLAUM, *Chief Judge.* The defendant-appellee, Auburn
Gear, terminated benefits to retired employees of Auburn
Gear and its predecessor Borg-Warner. The retired em-
ployees filed suit, claiming that their collectively bar-
gained insurance agreements provided "lifetime benefits"
that could not be terminated. The district court found that
the language of the collectively bargained insurance
agreements limited benefits to the term of the agreements
and contained no patent or latent ambiguities. As a result,
when the terms of the collectively bargained insurance
agreements expired, so did Auburn Gear's obligation to

provide benefits. On this basis, the district court granted summary judgment for Auburn Gear.

For the following reasons, we now affirm the judgment of the district court.

## I. Background

The plaintiffs-appellants are retired hourly employees of a manufacturing facility located in Auburn, Indiana. Throughout the relevant time period, the employees (now "retirees") were represented by United Auto Workers Local 825 ("Union"). Approximately every three years, the Union negotiated a new collective bargaining agreement ("CBA") and collectively bargained insurance agreement ("CBIA") with the employer. The original employer, Borg-Warner Corporation, sold the facility to Auburn Gear in November 1982.[1]

The retirees' health insurance benefits were discussed in each CBIA. Although Union representatives sometimes met with the retirees to explain new terms in the contracts, there is no allegation that the Union required the retirees' consent to ratify the CBIAs.

At issue in this case are CBIAs negotiated by Borg-Warner and the Union covering the time periods from 1971-74, 1974-77, 1977-80, and 1980-83, as well as the CBIAs between Auburn Gear and the Union covering the time periods from 1983-1986, 1986-1989, and 1989-1992.

The 1980-83 CBA contains an integration clause similar to integration clauses contained in the other relevant agreements:[2]

---

[1]  When Auburn Gear purchased the plant in 1982, it agreed to be bound by all agreements with the Union currently in effect.

[2]  Each contract contains many similar terms. Unless other-
(continued...)

9.1.1 It is understood that this Agreement, together with the following Agreements, shall be considered the full working arrangement between the Company and the Union:

(a) Retirement Income Agreement and Plan.

(b) Insurance Agreement.

(c) Supplemental Unemployment Benefit Agreement and Plan.

9.2.1 Each said Agreement shall be considered a separate portion which can be negotiated independently. . . .

Section I of the 1971 CBIA, entitled Group Insurance Agreement, states, "The Company will maintain *during the period of this Agreement* . . . [various insurance and other benefits] as set forth in this agreement." (Emphasis added.) Each CBIA, including the 1971 contract, states, "This Agreement shall be in full force and effect until midnight [of the expiration date.]" Section II of the CBIA sets forth benefits available to active employees. Section VI describes healthcare benefits and life insurance plans available under the CBIA to retired employees.

The first CBIA between the Union and Auburn Gear was signed in 1983. Except for the effective dates of coverage, most contract terms remained the same as the terms negotiated by the Union and Borg-Warner. However, the 1983 CBIA contained different language relating to bridge and transition benefits. In the 1980 CBIA these benefits were available to retirees who had retired under total and permanent disability provisions. In

---

[2] (...continued)
wise noted, a term from one contract is matched by a similar term in each of the contracts.

the 1983 CBIA these benefits were limited to active employees.

Additionally, the 1983 CBIA is the first CBIA to address the impact of Medicare supplemental insurance. Under the contract, individuals who had previously retired ("Borg-Warner Retirees") were not subject to certain increases in deductibles, percentages, or out-of-pocket limitations that new retirees were.

In an attempt to explain the parties' contemporary understanding, the retirees present handwritten minutes from a meeting on March 28, 1983. These minutes recount an exchange between Auburn Gear's chief negotiator and the Union President. Auburn Gear's negotiator stated, "When we entered into negotiations we had told you that retiree costs couldn't be changed, now we think it can be changed." The Union President responded, "It is our legal opinion that we can't negotiate away retiree benefits."

Auburn Gear claims its major goal in the 1983 negotiation was to eliminate benefits under the "30 and out" provision, which allowed employees to retire before reaching the age of 65. Under the 1983 CBIA, employees who retired before the age of 65 were not eligible for retiree benefits until their sixty-fifth birthday. Immediately following the execution of the 1983 contract, however, and pursuant to negotiations, a group of fifteen to twenty "grandfathered" active employees were sent letters— signed by Terry Dean, a supervisor for Auburn Gear— stating that they would still be eligible for the "30 and out" provision. Auburn Gear made this exception to avoid an exodus of experienced employees. In subsequent agreements, these "grandfathered" employees were treated as if they retired under the previous Borg-Warner contract.

In his deposition, Union President Salvatore Bevilacqua admitted that the 1983 CBIA altered the prescription drug plan for retirees, adding a $3 co-pay that applied to both

new and existing retirees. Terry Dean explained that, as he understood the plans in 1983, benefits were not vested. Although retirees could elect to take a pension benefit plan that would last until they died, "the insurance benefits were contract to contract." During his deposition, Dean explained that his letter was intended to communicate to the retirees that their benefits "were vested and that they would receive those benefits when they retired *as long as they were negotiated in every agreement*." (Emphasis added.) In addition to the $3 prescription co-pay, beginning in 1983, retirees who were ineligible to receive Medicare were charged a monthly fee to retain their hospital and surgical benefits.

In 1986, a preferred care plan was added and the provisions for retirees not eligible for Medicare were changed to include deductibles. In the 1989 CBIA, contributions and co-pays were altered again.

The plaintiffs claim that Auburn Gear's actions during a 1990 arbitration proceeding demonstrates that Auburn Gear understood the benefits to have an indefinite duration. Auburn Gear claimed it was not obligated to provide benefits and possible survivor benefits to a 24-year-old spouse of a 53-year-old retiree. Terry Dean stated that Auburn Gear did not want to be "stuck . . . paying for an uncontrollable amount of benefits over an uncontrollable amount of time." Auburn Gear lost the arbitration.

A new CBIA signed on December 16, 1991, introduced language that was significantly different from previous CBIAs. For the first time, the CBIA included "retiree benefits" in the list of items that Section I specified Auburn Gear must "provide during the term of the agreement." The 1991 agreement also tied the duration of the CBIA to the duration of the CBA.

Retiree insurance was provided by Auburn Gear until the 1998-2001 agreements expired in April 2001. A series of

letter agreements between Auburn Gear and the Union continued retiree insurance until November 3, 2002. In October 2002, Auburn Gear informed the Union of its intention to terminate retiree health insurance benefits. The Union's active employees went on strike on November 3, 2002. The next day Auburn Gear sent a letter to all retirees terminating benefits. The retirees challenge that termination.

## II. Discussion

We review the district court's grant of summary judgment de novo. *See, e.g.*, *Matuszak v. Torrington Co.*, 927 F.2d 320, 322 (7th Cir. 1991). Summary judgment is not warranted when there are genuine issues of material fact with respect to the interpretation of a contract. *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). "[A] contract's meaning is a matter of law, and where there is no contractual ambiguity, there is no resort to extrinsic evidence, hence no factual dispute to preclude summary judgment." *Id.* (citing *GCIU Employer Ret. Fund v. Chi. Tribune Co.*, 66 F.3d 862, 864-65 (7th Cir. 1995)). Unless patent or latent ambiguity can be proven, "extrinsic evidence is not proper to stave off summary judgment." *Barnett v. Ameren Corp.*, 436 F.3d 830, 832 (7th Cir. 2006).

Unlike pension benefits under ERISA, insurance benefits, such as the benefits at issue in this case, do not automatically vest. *See, e.g.*, *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 604-05 (7th Cir. 1993) (en banc), *cert. denied*, 510 U.S. 909 (1993). Unless a contract provides for the vesting of benefits, the presumption is that benefits terminate when a collective bargaining agreement ends. *Bidlack,* 993 F.2d at 606-07; *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998) ("ERISA does not require the vesting of welfare benefits; if they vest at all, they do so under the terms of a particular contract.").

The presumption that healthcare benefits do not exceed the life of an agreement imposes a high burden of proof upon the retirees. *See Bidlack*, 993 F.2d at 606-07; *Rossetto, v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 544 (7th Cir. 2000) ("[A]s word of the *Bidlack* presumption spreads and collective bargaining agreements are renegotiated, it will become obvious to unions that if they want to assure that employer-paid health benefits for the workers they represent are vested they will have to insist on explicit language to this effect."). This presumption can be rebutted by extrinsic evidence only if an ambiguity exists in the contractual language or if there is a "yawning void . . . that cries out for an implied term." *Bidlack*, 993 F.2d at 608.

The district court correctly relied upon the standards for contract interpretation enunciated by this Court in *Rossetto*:

> 1. If a collective bargaining agreement is completely silent on the duration of health benefits, the entitlement to them expires with the agreement, as a matter of law (that is, without going beyond the pleadings), unless the plaintiff can show by objective evidence that the agreement is latently ambiguous, that is, that anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says. This is the *Bidlack* presumption and its latent-ambiguity rebuttal.

> 2. If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence. This is a general rule of contract law, independent of but consistent with *Bidlack*.

3. If there is language in the agreement to suggest a grant of lifetime benefits, and the suggestion is not negated by the agreement read as a whole, the plaintiff is entitled to a trial. Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment in his favor. We are speaking of a case in which merely suggestive language creates a patent ambiguity.

4. If the plaintiff is entitled to a trial by reason of either a patent or a latent ambiguity, the normal rules of evidence will govern the trial, and so the parties will not be limited at trial to presenting objective evidence of meaning.

217 F.3d at 547.

When examining a collectively bargained insurance agreement, the language of the contract itself and the existence or non-existence of patent ambiguity will determine which of the four models for contract interpretation presented in *Rossetto* the Court will utilize. We examine the contract to determine if the CBIA is "completely silent on the duration of health benefits," if it "makes clear that the entitlement expires with the agreement," or "[i]f there is language in the agreement to suggest a grant of lifetime benefits." *Rossetto*, 217 F.3d at 547.

A patent ambiguity is "[a]n ambiguity that clearly appears on the face of a document, arising from the language itself." BLACK'S LAW DICTIONARY 88 (8th ed. 2004). When "an ambiguity is apparent just from reading the contract without having to know anything about how it interacts with the world—then the contract has what is called a patent, or intrinsic, ambiguity, and evidence is admissible to cure it." *Rossetto*, 217 F.3d at 543 (citations omitted). "Only if the language of the plan document is ambiguous and these ambiguities are not clarified elsewhere in the document may we consider evidence of the parties' intent that is extrinsic to the writing." *Bland v.*

*Fiatallis N. Am., Inc.*, 401 F.3d 779, 784 (7th Cir. 2005) (citing *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632-33 (7th Cir. 2004)).

The plaintiffs have attempted to analogize this case to *Bidlack v. Wheelabrator Corp.* 993 F.2d 603. *Bidlack* allowed the introduction of extrinsic evidence to establish intent where an agreement was not silent, but "merely vague," as to whether employer-provided benefits constituted a perpetual entitlement. *Id.* at 608.

The plaintiffs' comparison to *Bidlack*, however, is misplaced. The language in this CBIA goes beyond vagueness or silence, and explicitly states that the benefits at issue in this case expire at the end of the contract's term. Thus, we find no patent ambiguity.

Section I of the CBIA states:

> The *Company will maintain during the period of this agreement*, subject to the terms and conditions established by the master plan or plans with the insurance carrier or carriers, a program of life insurance, accidental death and dismemberment insurance, accident and sickness insurance, hospital and surgical benefits, outpatient diagnostic X-ray and laboratory benefits, X-ray and radio-active therapy benefits, emergency first-aid benefits, transition and bridge benefits, prescription drug plan, dental plan, extended care benefits, vision care, and extended disability benefits as set forth in this agreement.

(emphasis added). Auburn Gear's obligation to provide benefits continues "during the period of this agreement," but not beyond.

In *Corrao*, we examined the following contractual language, similar to Section I's provisions: "For the term of this agreement, the employer . . . shall provide major medical, health, dental, sickness and accident, and life insurance benefits in accordance with [another part of the agree-

ment]." This Court found that the quoted language limited each named benefit to the "term of this agreement," as if the phrase had been inserted when discussing each benefit specifically. *See Corrao*, 161 F.3d at 441.[3] Although *Corrao* recognized the harsh result of the *Bidlack* presumption, the Court found that termination of benefits without reference to extrinsic evidence is appropriate where the text of an agreement, accompanied by an integration clause, provides no gaps to fill or ambiguous terms to be interpreted. *Id.*

Section I makes no attempt to indicate that it is exclusive to active employees or only applies to Section II of the CBIA (which does not include the retirees). The retirees claim that because Section I uses the singular "program," it can't apply to both retirees and active employees. This argument lacks merit. The singular "program" applies to the entire agreement.

Further evidence for the general nature of Section I is found in the clause limiting Auburn Gear's obligation "to the terms and conditions established by the master plan or plans with insurance carrier or carriers." This warning appears nowhere else in the CBIA, but is vital to notify retirees and active employees of the possibility that changes outside the company's control could occur. Thus, Section I acts as an overriding preamble for both active and retired employees.

As in *Corrao*, the parties' practice of changing the contractual terms in succeeding agreements lends support to Auburn Gear's claim that neither party understood the benefits to be permanent or inalterable. *See Corrao*, 161

---

[3] Judge Ripple dissented in the *Corrao* case, arguing that the Court's rule was overly rigid. 161 F.3d at 443 (Ripple, J., dissenting). Judge Ripple's criticism underscores this Court's reluctance to introduce extrinsic evidence into the retrospective reading of labor benefit contracts.

F.3d at 442 ("[The employer's] behavior suggests that it did not believe that it was forbidden to change benefit levels for retirees. It shifted the package around, and it imposed various forms of managed care on the retirees."). In the instant case, every three years, when the CBIA was renegotiated, the parties felt free to alter co-pays and other benefits.

The retirees argue that the CBIA is implicitly extended beyond its three-year term by a clause that provides benefits for surviving spouses until their death or remarriage. This provision, however, refers to the eligibility of individuals to receive benefits under the agreement, not to the *duration of the agreement*. Surviving spouses were eligible to receive benefits only so long as the CBIA was in place.

It is well established that "lifetime" benefits can be limited to the duration of a contract. We have previously found that where a reservation of rights clause coexists with a guarantee of lifetime benefits, "[w]e must resolve the tension between the lifetime benefits clause, and the plan termination and reservation of rights clauses, by giving meaning to all of them. . . . [A]lthough the plan in its current iteration entitles retirees to health coverage for the duration of their lives and the lives of their eligible surviving spouses, the terms of the plan— including the plan's continued existence—are subject to change at the will of [the employer]." *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (citations omitted); *see also Vallone,* 375 F.3d at 633.

The provision in Section I of the CBIA, limiting benefits to the "period of this agreement," is a reservation of rights clause. *See Barnett*, 436 F.3d at 834 (7th Cir. 2006). At the end of each CBIA, lifetime benefits ceased and Auburn Gear was free to revoke or modify benefits. *See id.* at 833-34 (citing *Vallone* 375 F.3d at 633). So long as the CBIA was in

effect, benefits remained valid; when the CBIA ceased to be effective, "lifetime benefits" ceased as well.

The retirees also allege that similarities in language between the pension plan and CBIA demonstrates an intention to vest health benefits. While pensions are assumed to vest, there is no similar presumption in the provision of healthcare benefits. "[T]he packaging of a welfare benefit with pension benefits does not on its own alter our presumption against vesting in the absence of express language to the contrary." *Vallone*, 375 F.3d at 633 n.4. Words that signify a lifetime commitment in a pension plan may not have the same effect in the context of health benefits. While this may seem illogical, it is what the "beady eyes of the law" require. *See id.* at 634. The retirees must be held to the contract terms negotiated by their representatives. Under the CBIA, benefits must be provided to the retirees only so long as the CBIA is in effect.

Given our observations above, the second of the four scenarios discussed in *Rossetto* is applicable to the instant case. "If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as 'during the term of this agreement,' . . . the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence." 217 F.3d at 547.

A latent ambiguity is "[a]n ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed." BLACK'S LAW DICTIONARY 88 (8th ed. 2004). A classic example of latent ambiguity is the tale of the *Peerless*. A contract to buy cotton scheduled to arrive from Bombay, India, on the ship *Peerless* appeared plain on its face. Objective evidence revealed, however, that there were actually two ships by the same name. Thus, it became unclear which ship the goods would be on and

extrinsic evidence was appropriate to aid in the resolution of the ambiguity. *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864). If a contract lacks latent ambiguity, however, "[e]xtrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." *Bidlack*, 993 F.2d at 608 (citing *Calder v. Camp Grove State Bank*, 892 F.2d 629, 632 (7th Cir. 1990)).

The retirees allege that four pieces of "objective evidence" are demonstrative of latent ambiguity: (1) the 1991 change in the language of Section I to include "retiree benefits" in the list of benefits limited to the term of the agreement; (2) the 1983 statements by the company's lead negotiator indicating a belief that retiree benefits could not be changed; (3) the 1983 grandfathering of eligible employees; and (4) the 1990 arbitration proceeding. Despite the retirees' protests to the contrary, this evidence does not demonstrate latent ambiguity. While this evidence does suggest alternative *interpretations* of the contract, it is insufficient to reveal an ambiguity.

In the CBIA signed by the parties in 1991, the term "retiree benefits" was added to the list of benefits to be provided "during the term of this agreement." Both parties agree that following the 1991 CBIA, retiree benefits are only available for the term of the contract. While it is true that a change in the language of a contract can sometimes indicate a change in meaning, this is not an absolute rule. The 1991 change was part and parcel of a general change in formatting. In the contract format introduced in the 1991 CBIA, each element listed in Section I represents a section heading. This change in formatting is insufficient to prove that earlier CBIAs had not limited the duration of retiree benefits.

Handwritten minutes recounting statements made during the March 1983 negotiations are also insufficient to demonstrate latent ambiguity. In the minutes, Auburn

Gear's representative states, "When we entered into negotiations we had told you that retiree costs couldn't be changed, now we think it can be changed." The Union President responded, "It is our legal opinion that we can't negotiate away retiree benefits."

Isolated comments by company officials that are "far from definitive as to any obligation to provide lifetime health-care benefits do not allow us to look beyond the written contracts agreed to by the parties." *Barnett,* 436 F.3d at 835 (7th Cir. 2006) (citing *PMC, Inc. v. Sherwin-Williams Co.,* 151 F.3d 610, 614-15 (7th Cir. 1998)).[4]

The 1983 grandfathering of eligible retirees also fails to demonstrate latent ambiguity. Letters sent to selected employees prior to the signing of the 1983 contract stated that these employees would maintain "the same pension and insurance benefits that you would have received had you retired on April 1, 1983." This language signifies nothing concerning the meaning of the contract itself. We have no reason to quarrel with the deposition of Terry Dean, a representative of Auburn Gear, who stated that the

---

[4] If anything, the March 1983 comments appear to indicate an agreement to disagree. We recently addressed the impact of such differences.

> The problem for the plaintiffs is that it is not reasonable to read this stark agreement to disagree as actually resulting in an agreement on [the employer's] part to provide vested health-care benefits to retirees. The only reasonable interpretation of this contractual provision is that there was no agreement as to the vested nature of the benefits. Extrinsic evidence is used to clarify an ambiguous *agreement*; it is not allowed to circumvent the requirement of mutual assent thereby allowing a party to create through litigation an obligation it was unsuccessful in obtaining during negotiations.

*Barnett,* 436 F.3d at 834 (7th Cir. 2006).

letter's intent was to convey that the retirees "were vested and that they would receive those benefits when they retired *as long as they were negotiated in every agreement*." (Emphasis added.) The letters do not place the "grandfathered" employees in a separate category from employees whose benefits are subject to the "term of the agreement" limitation in Section I of the CBIA. They merely place the "grandfathered" employees in the same situation as those who retired prior to 1983.

The fourth and final argument for latent ambiguity advanced by the retirees is that Auburn Gear's actions during a 1990 arbitration action somehow reveals an understanding that the retirees' benefits had vested. There is no evidence to support this conclusion. The arbitration was conducted under the terms of the agreement then in place. Any statements made by Auburn Gear indicating a fear of long-term payments to a particular individual are limited by the clear language of the contract, in which "lifetime benefits" are only operable so long as they are provided for in the current CBIA. The impact of Section I's limitation is unchanged by the retirees' subjective interpretation of the company's motive for arbitration.

### III.  Conclusion

Having found no patent or latent ambiguity in the collectively bargained insurance agreements, this Court concludes that Auburn Gear is under no obligation to continue to provide benefits to its former employees. The explicit language of the contract and this Court's presumption against the vesting of healthcare benefits all weighed heavily against the retirees.

Either lack of communication or an inadequate performance on the part of the Union led the retired employees and their survivors to believe their benefits could not be terminated. As we stated in a similar case, "this story

does not have a happy ending." *Vallone*, 375 F.3d at 642-43. We are mindful of the burden placed upon retired individuals with fixed incomes who now must bear an unexpected increase in healthcare costs. *See id*; *Corrao*, 161 F.3d at 442. "However, we are bound to determine only whether a legally sufficient agreement between the parties exists to support the plaintiffs' claim." *Barnett*, 436 F.3d at 835 (7th Cir. 2006). If a union "want[s] to assure that employer-paid health benefits for the workers they represent are vested they will have to insist on explicit language to this effect." *Rossetto*, 217 F.3d at 544. In this case, the Union failed to obtain the necessary contractual language.

The distinction between lifetime benefits and vested benefits is "a legal distinction that understandably escaped" many of the retirees. *Vallone*, 375 F.3d at 642. "It is difficult to imagine that someone without legal training would be able to fully comprehend a reservation of rights clause and how a court would interpret such a clause." Jennifer Claire Sprague, Note, *How Secure are Your Lifetime Benefits?, Vallone v. CNA Financial*, 375 F.3d 623 (7th Cir. 2004), 30 S. ILL. U. L.J. 195, 213 (2005). To avoid this information gap, Union representatives must be mindful of their responsibility to deliver the benefits they have promised and not guarantee benefits they have failed to obtain through explicit contractual language.

The contractual language at issue in this case was clear: "lifetime" benefits extended only so long as the collectively bargained insurance agreement remained in effect. Therefore, we AFFIRM the judgment of the district court granting summary judgment for Auburn Gear.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*