# United States Court of Appeals
## For the First Circuit

No. 14-2156

MERCURY SYSTEMS, INC.,

Plaintiff, Appellant,

v.

SHAREHOLDER REPRESENTATIVE SERVICES, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Thompson, Lipez, and Barron,
Circuit Judges.

Christopher H.M. Carter, with whom Hinckley, Allen & Snyder LLP was on brief, for appellant.
Roger A. Lane, with whom Courtney Worcester and Foley & Lardner LLP were on brief, for appellee.

April 26, 2016

**LIPEZ**, **Circuit Judge**.  We must interpret a merger agreement in which one party agreed to indemnify the other against a purely hypothetical tax loss.  The sellers agreed to indemnify the buyer for the tax liabilities of the company being sold, except that the tax bills for indemnification purposes were to be calculated as if certain deductions would not be taken, when both parties knew they would be.  Given that these deductions, perhaps in combination with other deductions, reduced the company's tax liability to zero, the company's tax prepayments and credits were refunded in their entirety, benefitting the buyer as the company's new owner.  Yet, because the calculation of the indemnity obligation was based on a counterfactual measure of tax liability, that calculation resulted in the sellers' nonetheless owing the buyer a substantial amount of money.  The issue that divides the parties is whether the prepayments and credits, and resulting tax refunds, affect the tax indemnification obligation of the sellers.

The district court concluded that the indemnification provision, by its terms, unambiguously required that the indemnity obligation be offset by the amount of the refunded prepayments and credits.  It therefore entered judgment on the pleadings in favor of the seller.

We conclude that the indemnification provision is ambiguous as to how the tax refunds affect the indemnification obligation of the sellers.  Though these sophisticated parties

knew of the tax prepayments and credits, and expected substantial tax refunds, they failed to specify how those refunds should be treated. This critical omission renders their contract ambiguous on the issue before us. The plain language arguments of the parties are not fully convincing; reasonable interpretations of the text support both positions. Their arguments about the purpose and negotiating history of the provision cannot be resolved without the aid of a fact-finder. Indeed, the parties dispute key facts about the company's tax refunds. Hence, we vacate the judgment of the district court and remand for further proceedings.

I.

## A. Background

The indemnity provision at issue is part of a 2011 merger agreement by which Mercury Systems, Inc.[1] ("Mercury") purchased KOR Electronics ("KOR") from KOR's stockholders and optionholders ("securityholders," represented on appeal by Shareholder Representative Services, Inc., "SRS"). Consistent with the terms of the agreement, Mercury created a merger subsidiary (King Merger Inc.) and merged it with and into KOR, which thus became a wholly-owned subsidiary of Mercury.

Mercury agreed to pay KOR's securityholders $70 million for the company, with adjustments for, inter alia, merger-related

---

[1] At the time of the transaction, Mercury was called "Mercury Computer Systems, Inc."

expenses and the amount of cash and debt on KOR's books as of the closing date.  Merger Agreement ["MA"] § 3.02.  These adjustments would be based on a balance sheet reflecting estimates of KOR's 2011 assets and liabilities, which KOR promised to provide.  MA § 3.05(a).  Of the purchase amount of $70 million, $10.65 million would be paid into an escrow account to cover various obligations of the securityholders.  MA § 3.03(b).

The indemnity arrangement relevant to this appeal is set forth in detail in Article X, section 10.02(a), and referenced in sections 10.01 and 10.05(a) and (b).  Section 10.02(a) provides that SRS will prepare KOR's 2011 federal and state tax returns.  Then, SRS, on behalf of the former securityholders, must release money from the escrow account to pay Mercury "the amount of the aggregate Tax liabilities due, if any."  App. 31-32.[2]  The unusual feature of the arrangement is how the obligation to pay Mercury was to be measured.  When preparing KOR's 2011 tax returns, SRS was required to claim two types of merger-related expenses as tax deductions.  This requirement is stated in section 10.02(a) and echoed in sections 10.05(a) and (b).  App. 41-42 (requiring SRS to "giv[e] effect to any deductions described in Section 10.[0]5"); id. at 54-55 (specifying that the merger-related deductions "shall

---

[2]    The relevant text of the merger agreement, including section 10.02, is set out in the Appendix ("App.").  Citations to the appendix refer to particular line numbers therein.

- 4 -

be claimed"); id. 61-62 (same).  However, the securityholders' obligation to pay Mercury was to be calculated without claiming those deductions.  MA § 10.02(a).  The arrangement is set forth as follows:

> [F]or purposes of determining the Tax liability due with respect to such Tax Return for purposes of calculating the Securityholders' indemnification obligations, the determination of the Tax liability for any such Pre-Closing Tax Period will be calculated and determined excluding any deductions described in Section 10.05 below.  The amounts actually due on the Tax Return (after giving effect to any deductions described in Section 10.[0]5[3] below) shall promptly be paid by [Mercury] to the appropriate Governmental Authority.

Id. (App. 34-46) (emphasis in original).  In other words, Mercury would receive, in payment of the indemnity obligation, an amount from escrow equal to KOR's tax liabilities as calculated without the deductions, but pay KOR's actual taxes (if any were still owed) computed with the deductions.  Because KOR was required to claim the section 10.05 deductions on its 2011 tax return, the calculation of taxes without those deductions was necessarily greater than KOR's actual taxes owed.  SRS conceded in the district court that this arrangement could require it to pay Mercury for "a

---

[3]     The text refers to "Section 10.5 below," though no such section exists.  The parties clearly intended to reference section 10.05.

phantom 'liability' for indemnification purposes that is not actually due to the government."

Section 10.02(a) creates an obligation specific to one tax year, the year to which the merger-related tax deductions apply: 2011. Further, by its terms, section 10.02(a) applies only to taxes related to returns "due after the Closing Date." App. 25. The parties identify no tax period, other than 2011, for which returns had yet to be filed as of December 30, 2011. This obligation -- specific to 2011 -- is distinct from the conventional tax indemnification provision in section 10.01, which applies more generally to all pre-closing time periods:

> [E]ach Securityholder shall . . . indemnify and hold harmless [Mercury] from, against and in respect of any and all Losses[4] that constitute or that result from, arise out of or relate to, directly or indirectly [] Taxes (or the non-payment thereof) of [KOR] for all Pre-Closing Tax Periods . . . .[5]

---

[4]    "Losses" are defined to include, among other things, "assessments, fines, penalties, [and] Taxes." MA § 9.01(a). "Taxes," in turn, includes "any and all federal, state, local, or foreign taxes . . . including any interest, penalty, or addition thereto." MA § 1.01.

[5] "Pre-Closing Tax Periods" is defined to include the 2011 tax year, although the merger closed on the last day of that tax year. MA § 1.01.

MA § 10.01 (App. 6-11.).  Section 10.01 clarifies, however, that this general tax indemnification provision does not override the specific arrangement for 2011:

> Notwithstanding any other provision of this Agreement, the determination of the Taxes with respect to this Section 10.01 will be calculated without taking into account any deductions described in Section 10.05 below.

MA § 10.01 (App. 12-15).  In other words, section 10.01 recognizes that the former securityholders are required to indemnify Mercury for more than its actual tax losses for 2011, consistent with section 10.02(a).

Despite the detailed treatment of tax matters in Article X, and though the parties anticipated that KOR would receive tax refunds for 2011, the merger agreement does not explicitly address KOR's expected tax refunds or mention any offset.

Mercury, its subsidiary King Merger, KOR, and SRS (for KOR's securityholders) signed the merger agreement on December 22, 2011.  In connection with the agreement, KOR furnished Mercury with a Company Disclosure Schedule, including its consolidated financial statements.[6]  The statements contained tax data for prior

---

[6]  These statements are fairly incorporated into the First Amended Complaint.  See Beddall v. State St. Bank and Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998).

years and year-to-date tax figures for 2011. The merger closed on December 30, the last day of KOR's federal tax year.

To determine KOR's actual 2011 tax obligations, SRS took advantage of the merger-related deductions specified in section 10.05, as section 10.02 required. With those deductions taken into account, KOR operated at a loss for federal tax purposes and, consequently, had no federal tax liability. Having prepaid $1.42 million in federal taxes and owing no federal income tax, KOR was refunded all $1.42 million.[7] Similarly, after deducting the merger-related expenses, KOR was left with no income taxable by various states.[8] As a result, KOR's state tax prepayments and credits exceeded what it actually owed, and it accordingly received $340,000 in state tax refunds. SRS asserts that the federal and state refunds were the result of the merger-related tax deductions. Mercury disagrees, claiming that the parties "expected" that $1.76 million "in Tax pre-payments and over-payments would be refunded to KOR for the benefit of Mercury, irrespective of the Section

---

[7]  For the convenience of the reader, we round these figures to the nearest $10,000.

[8]  Mercury claims that KOR had no taxable income for state tax purposes, and, accordingly, its $340,000 in state tax prepayments were entirely refunded. SRS claims that KOR did owe some state taxes even after the deductions were taken into account. SRS claims that KOR prepaid $410,000 in state taxes, of which only $340,000 was refunded. Given our holding that the agreement is ambiguous, we need not determine whether SRS is correct that KOR's state tax prepayments must be offset, and, hence, need not consider whether those prepayments amount to $410,000 or $340,000.

10.05 Deductions." Whether or not the merger-related deductions were the cause, it is undisputed that KOR was refunded a total of $1.76 million by federal and state tax authorities for 2011, benefitting Mercury as KOR's new owner.

To determine the securityholders' tax indemnity obligation, Mercury recalculated KOR's tax liabilities without the deductions. In that calculation, KOR had a taxable income of over $6 million in 2011, resulting in substantial (though hypothetical) state and federal tax obligations. Mercury asserts that the correct measure of KOR's 2011 tax liabilities for indemnification purposes is $2.4 million. Because SRS already has paid $570,000 of the indemnity obligation,[9] Mercury now seeks $1.83 million from SRS. SRS agrees that $2.4 million is the correct measure of KOR's 2011 tax indemnification obligation, not counting prepayments and credits, but asserts that after the offset for the $1.76 million in prepayments and credits, only $640,000 was owed. Since SRS

---

[9] On August 31, 2012, Mercury claimed $620,000 for indemnification of KOR's (hypothetical) 2011 federal tax liability, calculated pursuant to section 10.02 of the merger agreement, including an offset for tax refunds. Mercury's claim certificate did not purport to discharge its tax indemnity claims entirely. SRS consented to release $570,000 from escrow, but contested $50,000 of the claimed amount. SRS did not state that it considered its tax indemnity obligations to be fully discharged. Then, on January 28, 2013, Mercury claimed the right to additional indemnification payments. Mercury had recalculated what it was owed under section 10.02(a), this time without offsetting the tax refunds. Mercury ultimately asked for $1.83 million ($2.4 million less the earlier payment of $570,000.)

previously paid $570,000, it argues that Mercury is now owed only $70,000.

**B.  Procedural History**

The operative complaint here is the First Amended Complaint, which Mercury filed against SRS and various former securityholders on October 21, 2013.  In it, Mercury asserted claims for, inter alia, declaratory relief and breach of contract.  In Count I, Mercury sought a declaration that it was entitled to $1.83 million from the escrow account pursuant to section 10.02(a)'s indemnification calculation.  In Count IV, Mercury asserted that SRS had breached the merger agreement by failing to release those funds from escrow, and sought damages.

SRS moved for partial judgment on the pleadings on Counts I and IV.  Mercury opposed the motion and filed a cross motion for partial judgment on the pleadings.  The district court granted SRS's motion for judgment on the pleadings, denied Mercury's motion, and entered judgment for SRS.  Mercury timely filed this appeal.[10]

---

[10]   The parties reached a partial settlement that resolved the remaining issues in the case, though preserving Mercury's claim under Count III for indemnification of attorney's fees and costs related to this action concerning Counts I and IV.

## A. Standard of Review

We review cross-motions for judgment on the pleadings de novo, viewing the pleadings in the light most favorable to the party opposing the motion. Curran v. Cousins, 509 F.3d 36, 43 (1st Cir. 2007). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Barnes v. Fleet Nat'l Bank, N.A., 370 F.3d 164, 170 (1st Cir. 2004) (quoting Wightman v. Springfield Terminal Ry., 100 F.3d 228, 230 (1st Cir. 1996)). This analysis is similar to that used for cross-motions for summary judgment, Curran, 509 F.3d at 44, though for the purposes of judgment on the pleadings the court ordinarily may consider only facts contained in the pleadings and documents fairly incorporated therein, and those susceptible to judicial notice, R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).

## B. Massachusetts Law

Under Massachusetts law, contract terms are ambiguous when they are "inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed and obligations undertaken." Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)). Ambiguity exists where "reasonably intelligent persons would differ as to which meaning is the proper one." Id. (quoting

Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 953 (Mass. 1998)); see also Caldwell Tanks, Inc. v. Haley & Ward, Inc., 471 F.3d 210, 215 (1st Cir. 2006). Where more than one interpretation fits the literal meaning of the text and is compatible with common sense and practical economic reality, a court may find a provision to be ambiguous as a matter of law. See Den Norske Bank AS v. First Nat'l Bank of Boston, 75 F.3d 49, 54-55 (1st Cir. 1996).

Where "the contract language is ambiguous, on its face or as applied," contract interpretation normally becomes a question of fact to be decided with reference to extrinsic evidence. Den Norske Bank, 75 F.3d at 52 (citing Freelander v. G. & K. Realty Corp., 258 N.E.2d 786, 788 (Mass. 1970); Robert Indus., Inc. v. Spence, 291 N.E.2d 407, 410 (Mass. 1973)). Extrinsic evidence may include the parties' negotiations during contracting, their course of performance under the contract, their course of dealing prior to the contract, and trade usage in the relevant industry. Id. at 52-53.

**III.**

As described above, this case involves three provisions of the merger agreement: sections 10.01, 10.02(a), and 10.05. The last of those, 10.05, simply obliges Mercury to take the applicable merger-related deductions when filing returns for "the Pre-Closing Tax Period," and it is not in dispute. The controversy centers primarily on section 10.02(a) and the indemnification amount it

requires SRS to pay Mercury. Although the parties agree that the provision's purpose was to pay Mercury the value of the merger-related tax deductions, they disagree on the magnitude of that benefit. The relationship between section 10.01, the general indemnification provision, and section 10.02(a) is one of the questions that must be considered in construing the latter provision.

SRS accepts that Mercury was owed the $2.4 million attributable to the merger-related deductions, but it insists that the parties understood that part of that amount -- $1.76 million -- had already been paid in the form of KOR's tax refunds. SRS draws support for its interpretation from the text of section 10.01, which imposes an indemnification burden on the securityholders for "losses," while instructing that the 10.05 deductions must be treated differently. Mercury, on the other hand, contends that SRS must pay the full $2.4 million from the escrow account. Mercury argues that, because KOR was in a tax loss position for 2011 and thus had no tax debt, KOR would have received full refunds of its tax prepayments even without the merger-related deductions. Hence, the refunds were unrelated to the payment required by section 10.02(a), and, under Mercury's reading, section 10.02(a) in effect amounted to a price adjustment.

We first review the pertinent terms of the agreement and then briefly consider the parties' additional contentions

regarding its construction.  See Den Norske Bank, 75 F.3d at 52-53.

## A. Plain Language

We begin our examination of the agreement's language with section 10.02(a), the provision that details the indemnification benefit to Mercury, and then consider whether the general indemnification provision, section 10.01, sheds light on how that benefit is to be calculated.

### 1.  Section 10.02(a)

This section, labeled "Tax Return Preparation," appears to have three primary purposes.  First, it states SRS's obligation to prepare, and Mercury's obligation to file, any KOR tax returns covering pre-closing time periods that are due after the merger's closing date.  App. 19-25.  That obligation, of course, incorporates the requirement of section 10.05 that Mercury take advantage of available merger-related deductions.  App. 40-44. Second, section 10.02(a) provides for a transfer of funds from the escrow account to Mercury to cover payment of the taxes due for the pre-closing period, but with the amount calculated as if the merger-related deductions had not been taken. App. 33-40.  Third, section 10.02(a) requires Mercury to promptly pay "[t]he amounts actually due on the Tax Return."  App. 40-41.  Thus, the text plainly requires payment to Mercury of an amount in excess of the

actual tax debt, leaving Mercury with a cash payment that appears to be, in effect, a purchase price adjustment.

Strikingly, section 10.02(a) does not in explicit terms address the fact -- known to both parties -- that KOR had made substantial prepayments of its tax obligations and, accordingly, expected refunds.[11] Mercury argues that this omission itself reveals that the parties did not intend to offset SRS's indemnity obligation by the amount of the anticipated refunds. It insists that a deduction of that magnitude from the tax liability calculation cannot be presumed from silence, and it asserts that implying an offset into the agreement is tantamount to rewriting the contract. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) (warning that courts should not "rewrite contracts freely entered into between sophisticated business entities" (quoting RCI Ne. Servs. Div. v. Bos. Edison Co., 822 F.2d 199, 205 (1st Cir. 1987))).

SRS, however, draws meaning from the fact that section 10.02(a) addresses both preparation of tax returns and the calculation of the indemnity obligation. It sees a plain recognition of the tax-refund offset in the relationship between

---

[11] KOR's tax prepayments and credits were among KOR's assets, as reflected on the balance sheet exchanged by the parties during negotiations. In addition, KOR's pre-closing financial disclosures informed the parties that the prepayments and credits would result in refunds.

the provision's requirements, emphasizing that SRS's obligation to make indemnification payments from the escrow account is expressly linked to the preparation of tax returns through the phrases "[w]ith respect to any such Tax Return," App. 25-26, and "with respect to such Tax Return." App. 34-35. Thus, SRS argues, the indemnification must be calculated "on the same basis as the 'real' tax calculation -- that is, on the basis of KOR's tax return -- with the only departure . . . being the exclusion of two deductions specified in Section 10.05." The "real" tax calculation would include deducting the amount of any prepayments and refundable credits to arrive at the amount owed at the time the return is filed. SRS thus reads section 10.02(a), in context, to include an offset for the amount of prepayments and refundable credits.

We conclude that the language of section 10.02(a) is reasonably susceptible to both of these interpretations. On the one hand, as Mercury argues, it is difficult to imagine the parties intending, but not expressly addressing, the substantial reduction in the indemnification obligation that would occur through an offset for the tax prepayments. Contrary to SRS's view, the language linking the indemnification amount to "such Tax Return" does not inevitably refer to the routine mechanics of calculating taxes -- with an offset for prepayments and credits -- but may be a simple reference back to the provision's subject-matter, i.e., a tax return due after the closing date for a pre-closing period.

- 16 -

If, as Mercury argues, the tax calculation was intended to define an appropriate "rebate" for Mercury -- rather than a classic "indemnification" -- it would be reasonable to conclude, absent explicit instruction to the contrary, that the agreement does not call for deducting the prepayments and credits. On the other hand, as described above, the focus in section 10.02(a) on both tax return preparation and indemnification makes plausible SRS's view that the required payment was intended to be a net amount.

Hence, the language of section 10.02(a), on its own, leaves us uncertain about what the parties intended. Notwithstanding its view that the section's plain language requires an offset for the tax refunds, SRS asserts that the text of section 10.01 clarifies any possible ambiguity and reinforces its contention that the amount owed to Mercury is the difference between the total merger-related tax savings and the refund amount. We thus consider whether the ambiguity we discern in section 10.02 is resolved by section 10.01's plain language.

**2. Section 10.01**

The conventional tax indemnification language of section 10.01 protects Mercury against, inter alia, "any and all Losses . . . relate[d] to . . . Taxes (or the non-payment thereof) . . . for all Pre-Closing Tax Periods." App. 8-10. SRS avers that this language, notwithstanding its generality, is susceptible to only one meaning. It asserts that the term "Losses," App. 8,

- 17 -

read in its "usual and ordinary sense," S. Union Co., 941 N.E.2d at 640, requires an offset for tax prepayments to be read into the agreement. In SRS's words, there can be no indemnifiable "Losses" arising from KOR's taxes if KOR has already "*actually paid*, and thereby *discharged*, all or part of any such Taxes."[12]

SRS may be correct that, once KOR's fictional tax liability for 2011 is determined, the fictional part of the calculation is complete and the amount owed to Mercury is intended to be determined as it would be in a typical indemnification scenario. Ordinarily, KOR's tax debt and, in turn, Mercury's out-of-pocket "loss," would be reduced by the amount of the prepayments and credits. However, it may be that the parties did not intend the word to be read in this way. In fact, supporting the conclusion that they intended the word to be read without regard to offsetting prepayments, the language in section 10.01 on which SRS relies is followed by the "Notwithstanding" proviso, which instructs that, regardless of "any other provision of this Agreement, the determination of the Taxes with respect to this Section 10.01 will be calculated without taking into account any deductions described

---

[12] The district court generally agreed with this construction, though it emphasized the plain meaning of the word "indemnification." In the court's view, the dictionary definition of the term shows that indemnification requires a pre-existing loss. Because it believed Mercury's loss was reduced by the amount of the tax refunds, the court reasoned that $1.76 million must be offset.

in Section 10.05 below." This sentence appears to say that neither the general indemnity obligation just stated, nor any other provision in the agreement, negates the unusual arrangement specified in section 10.02(a), i.e., that Mercury is owed an amount to be calculated by reference to a fictional tax liability.

Of course, the "Notwithstanding" sentence does not by its terms exclude the possibility that the ordinary concept of loss was intended in section 10.01 and thus was meant to be applied to the fictional liability, requiring a deduction for the prepayments and credits. It is also plausible to read the "Notwithstanding" caveat as recognizing and reinforcing a distinct method of calculating the "indemnification" obligation for the not-yet-completed 2011 taxes due, disregarding the usual method of determining a "loss." Indeed, as we have described, section 10.02(a) creates both a tax liability and thus an indemnification obligation where none in fact existed because of KOR's financial circumstances. That explicit fiction belies the inevitability of the parties' intention to apply a literal concept of "loss" to calculate the 2011 tax indemnification amount. See Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 294-95 (Mass. 1991) (recognizing that plain meaning does not control where context shows that the parties have assigned an unusual meaning to a term).

To the contrary, while section 10.01 as a general matter imposes responsibility on the securityholders for possible tax "Losses" resulting from future IRS audits, including for 2011, the section can reasonably be read to identify SRS's "indemnification" obligation at the time of the merger as the amount specified in section 10.02(a) -- without accounting for the prepayments and credits. The parties' sophistication and the obviousness of the refund issue makes it unlikely that, given the section 10.02(a) fiction, they would have hidden the answer to the refund question between the lines of section 10.01. Again, the absence of explicit reference to the anticipated refunds leaves the parties' intent unclear.

In sum, given that section 10.02(a) appears to use the tax liability context as a way to define a price adjustment -- and calls for a transfer of funds that ordinarily would not be described as an "indemnification" -- we have no confidence that the parties intended the ordinary calculation of "loss" to apply. We thus find no decisive guidance on the meaning of section 10.02(a) in the plain language of section 10.01.

**B. Other Arguments**

The parties offer multiple theories to support their competing contentions that the intent of section 10.02 is discernible from the provision's plain language. These theories

- 20 -

are largely fact-dependent and, hence, require judgments based on fact-finding that we cannot do.

SRS, for example, argues that KOR's tax refund must offset Mercury's recovery lest Mercury receive what it calls a double recovery, or a "windfall by recovering some amounts twice." As noted above, SRS believes that no refunds would have been paid absent the deductions. Because KOR's 2011 tax refunds are part of the benefit of the merger-related tax deductions, SRS argues, they must be counted against the former securityholders' indemnity obligation. To allow Mercury to claim KOR's 2011 tax refunds (worth $1.76 million), and the full $2.4 million value of the tax deductions without an offset, would give Mercury $1.76 million twice.[13] However, whether the refunds are solely attributable to the merger is a disputed fact that cannot be determined on the limited record before us. Moreover, this argument has force only if the parties in fact intended to define the total amount due to Mercury by the net benefit from the merger-related deductions. As we have explained, the agreement does not plainly limit the "indemnification" payment to that amount.

---

[13] The district court found this argument persuasive. It reasoned that Mercury "received the economic benefit it bargained for -- which is the 'benefit of the 10.05 deductions.'" It further observed that "[t]he 'benefit' of the tax refunds resulting from 10.05 deductions" and the "'economic benefit of the 10.05 deductions,' . . . are, in financial reality, overlapping."

Mercury, meanwhile, asserts that it bargained separately for the tax refunds and the tax indemnification provisions. It supports this assertion with drafts of the merger agreement and associated correspondence to and from its counsel during negotiations. [Mercury Br. 6-7.] However, we may not consider such evidence in our review of a judgment on the pleadings, as these materials are not fairly incorporated in the pleadings or susceptible to judicial notice, see R.G. Fin. Corp., 446 F.3d at 182, and Mercury cites no other basis on which they may be considered.[14]

## IV.

Although there are elements of reasonableness in both parties' arguments, neither party succeeds in clarifying the

---

[14] Mercury also makes another argument based on negotiating history. According to Mercury, KOR had substantial net operating losses (NOLs) from past years, which it had carried forward in the hope of reducing its taxable income in a future year. However, the NOLs could not be carried forward post-merger because section 382 of the Internal Revenue Code ("I.R.C.") does not allow Mercury as KOR's new owner to take advantage of them. To compensate for the lost value of KOR's NOLs, according to Mercury, "the parties negotiated for a cash payment to Mercury in an amount equal to the Tax benefit Mercury would have received had there been no limitation on the use of accumulated NOLs." Mercury claims that this amount is $2.4 million, and that if KOR's prepayments and credits are offset, it will get less than the tax benefit of the accumulated NOLs, and thus less than it bargained for. Again, however, Mercury's claims are not reflected in the text of the merger agreement. Nor does Mercury explain how it calculates the tax benefit it would have received if it had been permitted to use KOR's accumulated NOLs. We are left with no explanation to connect the NOLs -- allegedly made useless by I.R.C. § 382 -- to the conclusion that Mercury was owed $2.4 million rather than $640,000.

meaning of the merger agreement with respect to the offset issue. On this point, sections 10.01 and 10.02 are inescapably ambiguous; "reasonably intelligent persons would differ as to which meaning is the proper one." S. Union Co., 941 N.E.2d at 640 (quoting Citation Ins. Co., 688 N.E.2d at 953).

This ambiguity is remarkable given the sophistication of the parties. Mercury and the former owners of KOR agreed to a seemingly novel contract provision, incorporating elements of an indemnity and a purchase price adjustment. Although the parties knew that KOR had tax prepayments and credits and anticipated a 2011 tax refund, they failed to clarify how these prepayments and credits would affect the indemnification provision. Indeed, the failure to speak expressly to the issue suggests that the parties, inexplicably, may have neglected to address how the refunds would be handled. Having thus agreed to an ambiguous contract, the parties now must shoulder the costs of additional litigation in the district court to clarify its meaning, through consideration of negotiating history and other extrinsic evidence probative of the intentions of the parties, consistent with Massachusetts law. See Den Norske Bank AS, 75 F.3d at 52-53.

We vacate judgment in favor of SRS, affirm the denial of judgment to Mercury, and remand to the district court for further

proceedings consistent with this opinion.[15]  Each party shall bear its own costs.

So ordered.

---

[15]   Of course, these additional proceedings could be avoided if the parties settle this case.  We urge them to seriously explore that possibility.  Settlement counsel of the First Circuit stands ready to assist them in this effort.

## Appendix

<u>Excerpts from the Agreement and Plan of Merger</u>:

Section 10.01. <u>Tax Indemnification</u>.  From and after the Closing Date, each Securityholder shall . . . indemnify and hold harmless [Mercury] from, against and in respect of any and all Losses that constitute or that result from, arise out of or relate to, directly or indirectly [] Taxes (or the non-payment thereof) of [KOR] for all Pre-Closing Tax Periods . . . . . Notwithstanding any other provision of this Agreement, the determination of the Taxes with respect to this <u>Section 10.01</u> will be calculated without taking into account any deductions described in <u>Section 10.05</u> below.

Section 10.02. <u>Tax Return Preparation</u>.

(a) [SRS] shall cause to be prepared (and [Mercury] shall cause to be subsequently filed) in a timely manner all Tax Returns related to Pre-Closing Tax Periods (other than Tax Returns for a Straddle Period) which are required to be filed by [KOR], to the extent such Tax Returns are due after the Closing Date. . . .  With respect to any such Tax Return filed after the Closing Date that relates to any Pre-Closing Tax Period and upon the request of [SRS], the Escrow Agent shall make a distribution from the Escrow Amount to [Mercury] three (3) days prior to the filing of such Tax Returns the amount of the aggregate Tax liabilities due, if any, with respect to such Pre-Closing Tax Periods; <u>provided, however</u>, that for purposes of determining the Tax liability due with respect to such Tax Return for purposes of calculating the Securityholders' indemnification obligations, the determination of the Tax liability for any such Pre-Closing Tax Period will be calculated and determined excluding any deductions described in <u>Section 10.05</u> below.  The amounts actually due on the Tax Return (after giving effect to any deductions described in <u>Section 10.[0]5</u> below) shall promptly be paid by [Mercury] to the appropriate Governmental Authority. . . .

. . .

Section 10.05. <u>Allocation of Certain Expenses</u>

(a) Any Company Transaction Expenses, to the extent not required to be capitalized and included in [Mercury's] tax basis of the [KOR] stock and to the extent otherwise permitted by applicable Legal Requirements . . . shall be claimed as deductions for the Pre-Closing Tax Period ending on the Closing Date; and

(b) To the extent permitted by applicable Legal Requirements . . . any income tax deductions attributable to payments due at Closing to holders of Vested Options shall be claimed as deductions for the Pre-Closing Tax Period ending on the Closing Date.