In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 19-1601

HAROLD STONE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

SIGNODE INDUSTRIAL GROUP LLC and
ILLINOIS TOOL WORKS INC.,

*Defendants-Appellants*.

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-05360 — **Thomas M. Durkin**, *Judge*.

———————————

ARGUED SEPTEMBER 19, 2019 — DECIDED NOVEMBER 20, 2019

———————————

Before SYKES, HAMILTON, and BRENNAN, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Defendant Signode Industrial
Group LLC assumed an obligation to pay health-care benefits
to a group of retired steelworkers and their families. Signode
then exercised its right to terminate the underlying benefits
agreement. When it terminated the agreement, Signode also
stopped providing the promised benefits to the retired steel-
workers and their families, despite contractual language

providing that benefits would not be "terminated … notwith-standing the expiration" of the underlying agreement. This appeal presents a single question of contract interpretation: whether the agreement in question provided for vested bene-fits that would survive the agreement's termination. We hold that the contract provided for vested lifetime benefits and af-firm the district court's permanent injunction ordering Sig-node to reinstate the retirees' benefits.

I.  *Factual and Procedural Background*

The key language relevant to this dispute comes from a 1994 agreement and its 2002 successor. First, we describe the two agreements and their contexts, focusing on the disputed "Continuation of Coverage" and "Term of this Agreement" provisions. We then describe the events that followed the ex-ecution of the 2002 agreement and led to this lawsuit.

A.  *The Riverdale Plant and the Pensioners' Agreements*

Plaintiffs Harold Stone and John Woestman worked for decades at the Acme Packaging Corporation plant in Riverdale, Illinois. While they worked at the Riverdale plant, they were represented by the union-plaintiff—United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.

On January 1, 1994, Acme and the union entered into a "Pensioners' and Surviving Spouses' Health Insurance Agree-ment." The 1994 Pensioners' Agreement provided health in-surance benefits to retirees with at least fifteen years of con-tinuous service and to their families. The Agreement's "Con-tinuation of Coverage" provision said:

> Any Pensioner or individual receiving a Surviving Spouse's benefit who shall become covered by the Program established by this Agreement shall not have such coverage terminated or reduced (except as provided in this Program) so long as the individual remains retired from the Company or receives a Surviving Spouse's benefit, notwithstanding the expiration of this Agreement, except as the Company and the Union may agree otherwise.

The next provision was titled "Term of this Agreement." It read: "This Agreement shall become effective as of January 1, 1994 and shall remain in effect until December 31, 1999 and thereafter subject to the right of either party on 120 days written notice served on or after September 1, 1999 to terminate this Agreement."

The 1994 Pensioners' Agreement remained in effect until 2002, when Acme Packaging was going through bankruptcy. Acme negotiated a settlement agreement with the union to ease some of its financial obligations. As a part of the settlement, Acme and the union replaced the 1994 Pensioners' Agreement with a nearly identical successor called the 2002 Pensioners' Agreement. It left the Coverage Provision intact and modified the Term Provision only to move the earliest termination date back to February 29, 2004, providing that the agreement "shall remain in effect until February 29, 2004, thereafter subject to the right of either party on one hundred and twenty (120) days written notice served on or after November 1, 2003 to terminate the 'Pensioners' and Surviving Spouses' Health Insurance Agreement.'" The 2002 Pensioners' Agreement and the larger settlement of which it was a part

were approved by the bankruptcy court in February 2002, and Acme Packaging emerged from bankruptcy in November 2002.

In October 2003, defendant-appellant Illinois Tool Works (ITW) acquired the Riverdale plant from Acme and assumed its obligations under the 2002 Pensioners' Agreement. In April 2004, ITW decided to close the plant permanently and entered into an agreement with the union establishing the terms of the closure. Operations ceased completely in August 2004. For over a decade after the plant closed, ITW continued to administer the health insurance program pursuant to the 2002 Agreement, providing health-care coverage for Stone, Woestman, other Riverdale retirees, and their families.

B.   *This Lawsuit*

In 2014, ITW created a new entity, Signode Industrial Group LLC, and transferred its obligations under the 2002 Pensioners' Agreement to Signode. It then sold Signode to The Carlyle Group L.P. Signode continued to provide benefits under the Agreement until August 2015, when it notified the union that "effective January 1, 2016, the [health-care program] and the Agreement will terminate and participants will no longer be eligible for benefits thereunder." It notified the beneficiaries the next day. The union protested Signode's unilateral termination of benefits, citing the "notwithstanding expiration" language of the 2002 Agreement. Signode went ahead and discontinued the pensioners' health-care plan. It has not provided Riverdale retirees or their families with benefits since the end of 2015.

Plaintiffs Stone and Woestman filed this suit on behalf of a proposed class of similarly situated Riverdale retirees, their

dependents, and surviving spouses entitled to health-care benefits under the 2002 Agreement. They alleged that ITW and Signode had breached the 2002 Agreement in violation of both § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B). The union sued for breach of the 2002 Agreement under § 301 of the LMRA.

Both sides moved for summary judgment. The district court granted plaintiffs' motion and denied defendants' motion, holding that the 2002 Agreement did not give Signode the right to terminate the benefits. The district court entered a permanent injunction ordering Signode to reinstate health-care benefits under the 2002 Agreement. The district court has not yet acted on the issue of class certification or entered a final judgment, but we have jurisdiction over the defendants' appeal of the injunction under 28 U.S.C. § 1292(a). A motions panel of this court stayed the injunction pending appeal. After full briefing and argument on September 19, 2019, this panel vacated the stays.[1]

II. *Analysis*

The only question before us is whether the health-care benefits provided by the 2002 Pensioners' Agreement survived the termination of that agreement. We review a district court's grant of a permanent injunction for abuse of discretion. *Minnesota Mining & Manufacturing Co. v. Pribyl*, 259 F.3d 587, 597 (7th Cir. 2001). However, legal conclusions underlying the grant of a permanent injunction, including issues of

---

[1] On November 1, 2019, the district court ordered defendants to restore the health-care benefits no later than January 1, 2020.

contract interpretation, are reviewed *de novo. Id.*; *Soarus L.L.C. v. Bolson Materials International Corp.*, 905 F.3d 1009, 1011 (7th Cir. 2018).[2]

A. *Principles of Interpretation*

ERISA does not require that retiree health-care benefits be vested. Vesting of health-care benefits is determined according to ordinary principles of contract law. *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015); see also *Barnett v. Ameren Corp.*, 436 F.3d 830, 832 (7th Cir. 2006), quoting *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998) ("[I]f [benefits] vest at all, they do so under the terms of a particular contract."). *Tackett* and its successor, *CNH Industrial N.V. v. Reese*, 138 S. Ct. 761 (2018), endorsed the application of ordinary principles of contract law in such cases, and they rejected the "*Yard-Man*" presumptions in favor of vesting that the Sixth Circuit established in *International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Yard–Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983), and developed in subsequent cases. In particular, the Supreme Court in *Tackett* and *Reese* rejected the presumption of lifetime vesting

---

[2] Because the permanent injunction was based on a legal conclusion in the grant of summary judgment and this appeal challenges that conclusion, we must decide that legal issue in this appeal. See *Stone v. Signode Industrial Group, LLC*, 365 F. Supp. 3d 957 (N.D. Ill. 2019) (granting summary judgment to plaintiffs). In other words, we have jurisdiction under 28 U.S.C. § 1292(a) to review the relevant legal reasoning of the grant of summary judgment insofar as it is necessary to review the permanent injunction even though we do not have jurisdiction over the grant of summary judgment itself. Cf. *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1301 (Fed. Cir. 2005) (asserting jurisdiction over the grant of summary judgment itself under similar circumstances); *LaVine v. Blaine School Dist.*, 257 F.3d 981, 987 (9th Cir. 2001) (same).

where "a contract is silent as to the duration of retiree benefits." *Tackett*, 135 S. Ct. at 937; *Reese*, 138 S. Ct. at 763. The Supreme Court emphasized that "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Tackett*, 135 S. Ct. at 937, quoting *Litton Financial Printing Div., Litton Business Systems, Inc. v. NLRB*, 501 U.S. 190, 207 (1991). *Tackett* and *Reese* are consistent with the approach we have taken for decades. See, e.g., *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006), citing *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606–07 (7th Cir. 1993) (en banc), and *Pabst*, 161 F.3d at 439 ("Unless a contract provides for the vesting of benefits, the presumption is that benefits terminate when a collective bargaining agreement ends.").

Employers, employees, and unions are free, however, to provide that health-care benefits *will* survive the underlying agreement, so that promised lifetime benefits will indeed survive for a lifetime. *Tackett* and *Reese* teach that courts may not infer vesting from silence but also indicate that courts should find vesting where the contract provides for it: "a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." *Tackett*, 135 S. Ct. at 937, quoting *Litton*, 501 U.S. at 207 (alterations in *Tackett*). The contract may also provide for vesting through implied terms: "'[C]onstraints upon the employer after the expiration date of a collective-bargaining agreement' … may be derived from the agreement's 'explicit terms,' but they 'may arise as well from … implied terms of the expired agreement.'" *Id.* at 938 (Ginsburg, J., concurring), quoting *Litton*, 501 U.S. at 203, 207; accord, *Reese*, 138 S. Ct. at 765 (observing that a court may look to "explicit terms, implied terms, or industry practice" for indications of vesting). And if

the contract is ambiguous—due to either a patent or latent ambiguity—extrinsic evidence may be considered in determining whether the parties intended benefits to vest. *Reese*, 138 S. Ct. at 765; see also *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 545–46 (7th Cir. 2000) (looking to similar agreements with same employer and identical agreements within industry to find latent ambiguity on duration of health-care benefits).

B.  *Interpretation of the 2002 Pensioners' Agreement*

The 2002 Pensioners' Agreement unambiguously provided retirees with vested lifetime health-care benefits. The Coverage Provision said as plainly as possible that coverage would survive expiration of the Agreement. Contrary to defendants' arguments, the Term Provision did not transform the right to terminate the Agreement itself into a loophole that nullified the plain promise that benefits would survive expiration of the Agreement. And even if the Agreement were ambiguous, industry usage and the behavior of the parties here provide enough evidence to support vesting such that resolution of any ambiguity in favor of the plaintiffs as a matter of law would still be correct.

1.  *The Vesting Language for Continuation of Coverage*

The Agreement's Continuation of Coverage paragraph provided that covered individuals "*shall not have such coverage terminated or reduced* (except as provided in this Program) … *notwithstanding the expiration of this Agreement*, except as the Company and the Union may agree otherwise." (Emphasis added.)

This language made clear that the promised health-care benefits vested, i.e., they would survive the termination of the underlying agreement. In *Tackett*, the Supreme Court

endorsed this approach: vested benefits are created when an agreement "provid[es] in explicit terms that certain benefits continue after the agreement's expiration." 135 S. Ct. at 937, quoting *Litton*, 501 U.S. at 207. That is precisely what the 2002 Pensioners' Agreement did.

If more support were needed, cases addressing similar language provide persuasive support for the plaintiffs' position. In *United Steelworkers of America, AFL-CIO-CLC v. Connors Steel Co.*, the Eleventh Circuit held that an identical continuation-of-coverage provision created vested benefits. 855 F.2d 1499, 1505 (11th Cir. 1988) ("shall not have such coverage terminated or reduced … so long as the individual remains retired from the company or receives a surviving spouse's benefit, notwithstanding the expiration of this agreement"). Contrary to defendants' representations in their briefs and at oral argument, the contract in *Connors Steel* also included a termination provision like the one in the 2002 Pensioners' Agreement. *Id.* at 1502 ("Except as otherwise provided below, this Agreement shall terminate [upon] the expiration of sixty days after either party shall give written notice of termination to the other party but in any event shall not terminate earlier than September 1, 1983."). In *Keffer v. H.K. Porter Co.*, the Fourth Circuit held that materially identical continuation-of-coverage language also provided vested benefits. 872 F.2d 60, 63 (4th Cir. 1989).[3]

---

[3] Defendants suggest that the persuasive force of *Connors Steel* and *H.K. Porter Co.* is tainted by reliance on the *Yard-Man* inferences later rejected by the Supreme Court in *Tackett* and *Reese*. We disagree; these cases did not depend on *Yard-Man*. *Connors Steel* held that the unambiguous language of the agreement provided benefits, explained that this interpretation was consistent with *Yard-*

We have described the agreements in *Connors Steel* and *H.K. Porter Co.* as "specifically provid[ing] that the employer was obligated to continue making benefit contributions after the agreement expired," albeit in the context of differentiating them from a contract that did not vest benefits. *Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Shopmen's Div., Local No. 473 v. SR Industries Corp.*, 940 F.2d 665 (7th Cir. 1991) (table of decisions without reported opinions), 1991 WL 151901, at *4 (7th Cir. Aug. 9, 1991).

### 2. *The Term Provision*

To avoid the clear language providing health-care benefits that survive the expiration of the 2002 Agreement, defendants rely on the Term Provision. But the Term Provision only provides the means of expiration (contemplated in the vesting language of the Coverage Provision) by permitting either party "to terminate the 'Pensioners' and Surviving Spouses' Health Insurance Agreement.'" The Coverage Provision established that the promised health-care coverage and the underlying Agreement would run independently—that the

---

*Man*, and then clarified that the case for vesting was stronger than in *Yard-Man* because of the explicit vesting language identical to the language here. 855 F.2d at 1505. *H.K. Porter Co.* indicated only that the court's determination—based on "the language in the parties' agreements" and the conduct of the employer—was consistent with *Yard-Man*. 872 F.2d at 64. The Fourth Circuit later clarified that "the reference to *Yard-Man* was not necessary to [the holding in *H.K. Porter Co.*] that the specific language of the CBA showed the parties intended for benefits to continue beyond the expiration of the agreement." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 291–92 (4th Cir. 2011).

duration of the coverage was not limited to the term of the Agreement. Terminating the Agreement while leaving coverage intact was consistent with the vested benefits established by the Coverage Provision. Indeed, separating the term of coverage from the term of the Agreement clearly signaled that it was possible—actually, expected—that the Agreement could end without affecting the continued health-care coverage. That is what the Term Provision did.

Defendants argue that the term provision provided an exception to the promise that coverage would persist "notwithstanding expiration" of the 2002 Agreement and that their obligation to provide health-care benefits was extinguished upon termination of the Agreement. This interpretation of the Term Provision conflicts with the Coverage Provision and disregards ordinary principles of contract interpretation. Cf. *Barnett*, 436 F.3d at 833 ("Contractual provisions must be read in a manner that makes them consistent with each other.").

Defendants rely on cases that addressed contracts that included both "lifetime" language and reservation-of-rights clauses expressly allowing alteration or termination of benefits—but all without what we see here, express statements extending benefits beyond the term of agreement. See *Barnett*, 436 F.3d at 834 (agreement explicitly reserved employer's right to "'take such action as may be necessary to modify and to continue *for the life of the Labor Agreement*' the provisions of the health-care plan"); *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 638 (7th Cir. 2004) (agreement allowed employer "to *prospectively* alter or amend its welfare benefits offered to retirees, even after retirement"); *Int'l Union of United Auto., Aerospace & Agric. Implement Workers of Am. v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (agreement "reserve[d] the right

to modify, amend, suspend or terminate [benefits] at any time”).

These cases teach that “lifetime” language that might appear upon first reading to vest benefits should not be interpreted to do so if another provision reserves rights that are inconsistent with vesting. This lesson, painfully applied in many cases, does not apply here because the parties to the 2002 Agreement followed the lesson and made clear that the health-care benefits would survive the termination of that agreement. The Term Provision is not at all inconsistent with vesting. The entire purpose of the “notwithstanding expiration” language is to establish that termination of the Agreement *would not* extinguish the benefits it promised.

To try to create a conflict in need of resolution, defendants also propose that the Term Provision should be read to create an implicit exception to the vesting rule of the Coverage Provision because the Term Provision would otherwise be superfluous. This argument fails on several grounds.

First, even if this reading did render the Term Provision practically superfluous, this would not be enough to compel a tortured reading of the Coverage Provision that would nullify the parties’ clearly expressed choice to create vested retirement health-care benefits. The principle that contracts should be interpreted to avoid rendering language superfluous or redundant is not absolute. Rather, it is a preference to be employed to the extent possible given the range of reasonable meanings that can be ascribed to the contractual language. See 11 R. Lord, Williston on Contracts § 32:5 (4th ed., July 2019 update) (“An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable. A

court will interpret a contract in a manner that gives reasonable meaning to all of its provisions, if possible."); see also *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995) ("A contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms."). Given the clarity of the vesting language and the coherence of the contractual scheme under the more natural reading of the contract, defendants' position is not persuasive.

Second, the superfluity argument at best cuts both ways. If the Term Provision were read to allow the termination of benefits provided by the Agreement, then it would render superfluous the "notwithstanding the expiration of the Agreement" language in the Coverage Provision. What would be the point of establishing that benefits survive expiration of the Agreement if the only contractual provision for terminating the Agreement also terminated the benefits?

Third, the Term Provision simply is not superfluous when read—consistent with the vesting language of the Coverage Provision—to allow only for the termination of the Agreement and not of the benefits it provides to those already eligible for them. Collective bargaining agreements generally terminate at some point, giving the parties the opportunity to renegotiate. For retirement health-care benefits, this gives employers and employees the opportunity to change the scope of benefits for *future* retirees. As a general rule, an agreement like this one covers only those who retire while it is still in effect. If ITW had not closed the plant in 2004, it might have decided to scale back retirement benefits promised in the 2002 Pensioners' Agreement and exercised its termination right to

force the negotiation of a new Pensioners' Agreement, for future retirees.

The case law in this area—and indeed our very understanding of what it means for benefits to vest—is built upon the idea that collective bargaining agreements do not last forever. That is implicit in the Supreme Court's observation that "provid[ing] in explicit terms that certain benefits continue after the agreement's expiration" vests those benefits. *Tackett*, 135 S. Ct. at 937, quoting *Litton* 501 U.S. at 207. It is also implicit in our cases. See, e.g., *Auburn Gear*, 441 F.3d at 481 ("Unless a contract provides for the vesting of benefits, the presumption is that benefits terminate when a collective bargaining agreement ends.").

The Term Provision here was nothing more than a durational limit. Instead of setting a firm end date to the 2002 Pensioners' Agreement, it used a unilateral termination right to give the parties flexibility to extend the Agreement past a soft termination date. Defendants' superfluity theory—which by its reasoning would apply to *all* durational limits on benefits agreements—would lead to the impractical conclusion that no health-care benefits program could create vested benefits if it even contemplated the expiration of the agreement. The better reading of the 2002 Pensioners' Agreement thus favors plaintiffs.

### 3. *Extrinsic Evidence*

Even if the contract were ambiguous on the vesting issue, undisputed evidence of industry usage and the behavior of the parties makes clear that they understood the Agreement provided vested pension benefits. We interpret collective bargaining agreements in light of "relevant industry-specific

'customs, practices, usages, and terminology.'" *Tackett*, 135 S. Ct. at 937–38 (Ginsburg, J., concurring), quoting 11 R. Lord, Williston on Contracts § 30:4, pp. 55–58 (4th ed. 2012); accord, *Reese*, 138 S. Ct. at 765 ("when a contract is ambiguous, courts can consult extrinsic evidence to determine the parties' intentions"). We have applied this principle to interpret collective bargaining agreements in light of similar agreements with other employers. In *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539 (7th Cir. 2000), we interpreted a collective bargaining agreement between a brewery and the union of the plaintiff machinists. That agreement did not provide expressly for vesting and was silent regarding duration. *Id.* at 544–45. Nevertheless, we held that extrinsic evidence showed there was a latent ambiguity in the contract; we reversed summary judgment and remanded for trial. *Id.* at 545–47. We also found that *another employer's* continued provision of benefits under an identical but expired contract amounted to substantial evidence supporting the plaintiff-employees' interpretation of the agreement as promising vested benefits. *Id.* at 546.

The Steelworkers' agreements in *Connors Steel* and *H.K. Porter Co.*—and the Eleventh and Fourth Circuits' holdings that those agreements vested health-care benefits—provide compelling evidence of industry-specific usage here. See *Transportation-Commc'n Employees Union v. Union Pacific R.R. Co.*, 385 U.S. 157, 161 (1966) ("In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements."). For years before the negotiation of the 1994 Pensioners' Agreement here, the union used similar language in its health-care benefits agreements with other employers in the steel industry. Both the Fourth and Eleventh Circuits concluded that

such language created a vested right to health-care benefits. We characterized these agreements similarly in *SR Industries Corp.*, 940 F.2d 665, 1991 WL 151901, at *4.

Based on these precedents, the parties to the 2002 Pensioners' Agreement would have reasonably understood the language they chose to have the same effect it had been given by those courts. The background provided by these other agreements in the industry and their interpretation by courts support plaintiffs' interpretation, just as the provision of benefits in the parallel agreement in *Rossetto* supported the plaintiff-employees in that case.

This principle is similar to the prior-construction canon in statutory interpretation. See Antonin Scalia & Bryan Garner, *Reading Law* 322 (2012) ("If a statute uses words or phrases that have already received … uniform construction by inferior courts … they are to be understood according to that construction."). While contract interpretation differs from statutory interpretation in some ways, this principle applies in both: the actions of courts have given the phrase a meaning that parties knowledgeable in the relevant areas of law are presumed to use. See *id*. at 324.

The actions of a key Acme and ITW manager also reflect an understanding that benefits would vest. "How the parties to a contract actually perform their contractual undertakings is often … persuasive evidence of what the parties understood the contract to require." *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 618 (7th Cir. 2006); see also, e.g., *Mercury Sys., Inc. v. Shareholder Representative Servs., LLC*, 820 F.3d 46, 52 (1st Cir. 2016) (applying Massachusetts law) ("Extrinsic evidence may include the parties' … course of performance under the contract."). Here, Anthony Kuchta was a benefits program

administrator for Acme and ITW who helped negotiate the 1994 Pensioners' Agreement, the 2002 Pensioners' Agreement, and the 2004 Closing Agreement. He testified not only that he understood the 2002 Pensioners' Agreement to create vested lifetime benefits, but also that he advised employees that if they wanted those benefits, "they must retire under the 2002 Pensioners' Agreement and should do so before the 'last day' when the plant closed and the 2002 Pensioners' Agreement expired."

In other words, a manager who played a significant role in benefits administration—and who signed the 2004 Closing Agreement with the union—assured employees that the health-care benefits would last for their lifetimes, but only if they retired *under the 2002 Agreement*. This is not inadmissible, self-serving testimony offered in an attempt to vary the meaning of an unambiguous contract. Cf. *Rossetto*, 217 F.3d at 546. The testimony came from a now-neutral non-party who participated in negotiations on the side of the employer. Defendants have not rebutted this testimony, which is all the more powerful because the contemporaneous statements it describes invited employees to rely upon them when making retirement decisions.

The permanent injunction issued by the district court is

AFFIRMED.